**Barry M. BLACKMAN, Plaintiff,**

v.

**HUSTLER MAGAZINE, INC.,
Defendant.**

**Civ. A. No. 76–2103.**

United States District Court,
District of Columbia.

May 30, 1985.

Aidan D. Jones, Paul Martin Wolff, Washington, D.C., for plaintiff.

Angelo V. Arcadipane, Washington, D.C., Norman Zafman, Beverly Hills, Cal., Mark W. Foster, Zuckerman, Spaeder, Moore, Taylor & Kolker, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

In a previously-entered Memorandum Opinion and Judgment, defendant Hustler Magazine, Inc. ("Hustler") was adjudged liable to plaintiff Barry M. Blackman for copyright infringement and unfair competition in connection with Hustler's unauthorized publication of certain photographs taken and copyrighted by Blackman. Currently before the Court is the issue of damages, which was bifurcated from the liability issue and subsequently tried to the Court. Many of the facts relevant to damages have been stipulated; others were the subject of in-court expert- and fact-witness testimony, documentation, and the parties' numerous pretrial and post-trial submissions filed as recently as April 2, 1985. In addition, the facts underlying the Court's liability determination are fully set forth in the July 11, 1984 Memorandum Opinion, which is incorporated by reference into this Opinion.

Barry M. Blackman is a professional photographer who took nude photographs of Elizabeth Ray in September, 1972 when Ms. Ray was relatively unknown. Ms. Ray signed a release giving Blackman all rights to use, publish and copyright the photographs. Approximately four years later, in early June, 1976, the disclosure of Ms. Ray's relationship with a United States Congressman catapulted Blackman's former model into the public eye, and thereby substantially increased the potential value of Blackman's photographs. Recognizing that the publicity surrounding Ms. Ray could work to his advantage, Blackman published (for the first time) the 54 Ray photographs on June 14, 1976, with notice of his claims of copyright affixed to each. Mem. Op. 1–2; Joint Stipulation ("JS") 2.

On September 2, 1976, Blackman filed two copies of 53 of these photographs with the United States Register of Copyrights, who thereupon issued Blackman Certificates of Registration of a Claim to Copyright covering all 53 of the photographs. On April 8, 1977, Blackman filed the remaining Ray photograph with the United States Register of Copyrights, and was issued a Certificate of Registration of a Claim to Copyright for it as well. During the period from the creation of the photographs to the present time, Blackman has been the sole proprietor of the copyrights in the photographs, and has been the sole owner of all right, title and interest in the photographs, except as to such interest as he has expressly licensed to other persons. JS 3–5.

On June 14 and 15, 1976, Blackman announced, through the news media, that he was the photographer and owner of nude pictures of Elizabeth Ray, and that rights to publish those photographs were available for purchase. Daniel R. Montgomery, a business acquaintance of Larry Flynt, the publisher of Hustler, notified Flynt of Blackman's announcement and obtained Flynt's permission to negotiate with Blackman on behalf of Hustler for the rights to publish the Ray photographs. Blackman, through his agent William Tucker, sought $25,000 for the North American rights to commercial use of the photographs; Hust-

ler, through Montgomery, offered $16,000. On June 16, 1976, Tucker flew to Las Vegas, Nevada to negotiate directly with Flynt. The discussions between Tucker and Flynt, recounted in detail in the July 11, 1984 Memorandum Opinion, were inconclusive inasmuch as all involved knew that Blackman had retained authority to approve or reject any agreement negotiated by Tucker. At the close of the June 16, 1976 discussions, Flynt obtained from Tucker copies of the photographs which Tucker had shown to him, and contemporaneously signed a receipt dated June 16, 1976, which noted below the list of photographs received "All copyrighted by photographer Barry M. Blackman." After signing the receipt Flynt saw in Tucker's briefcase four original transparencies of additional Ray photographs and asked Tucker to leave those four behind as well. Tucker did so, after adding the four to the receipt. JS 6–11; Mem. Op.

The following day, Blackman sent a telegram to Hustler, which was received by Hustler, stating:

THIS IS TO CONFIRM THE ADVICE OF MY AGENT WILLIAM TUCKER TO YOU YESTERDAY THAT I HAVE RESERVED TO MYSELF PERSONALLY THE SOLE RIGHT TO APPROVE ANY SALE OF MY PHOTOGRAPHS OF ELIZABETH RAY. I AM CONSIDERING YOUR JUNE 16TH, 1976 OFFER AND WILL ADVISE YOU IN WRITING WHETHER I ACCEPT IT. HOWEVER I AM REQUIRING FULL PAYMENT AT THE TIME OF ANY SUCH ACCEPTANCE THAT I MIGHT SUBSEQUENTLY GIVE. [JS 12.]

On June 24, 1976 Blackman and Tucker entered into an agreement with Cheri Magazine for the purchase and sale of rights to the same photographs of Elizabeth Ray which Hustler attempted to purchase. Under the terms of that agreement, Blackman was tendered $20,000, with an additional $10,000 to be forthcoming if the photographs (or any individual photograph) were not published in Hustler or any magazine under the control of Larry Flynt prior to Cheri's publication. Mem.Op. at 31. Also on June 24, 1976, Blackman sent a telegram to Hustler Magazine, Inc., which was received by Hustler, stating:

THIS IS TO ADVISE THAT I REJECT YOUR OFFER OF JUNE 16 1976 TO PURCHASE MY PHOTOGRAPHS OF ELIZABETH RAY. YOUR $1,000 CHECK IS BEING RETURNED TO YOU BY MAIL.

I HEREBY DEMAND THAT YOU RETURN ALL OF MY PHOTOGRAPHS TRANSPARENCIES PRINTS AND COLOR SEPARATIONS OF ELIZABETH RAY. FAILURE TO COMPLY WITH MY REQUEST WILL BE AT YOUR PERIL.

By mail posted the following day, Blackman, through his attorney, returned Flynt's uncashed check with an accompanying letter from the attorney stating:

As you know, I represent Barry M. Blackman. Mr. Blackman has asked me to return to you the enclosed $1,000 check.

Mr. Blackman has also requested that I advise you to return to him all of his photographs, transparencies, prints and color separations of Elizabeth Ray. Any further misappropriation or unauthorized use by you of these properties of Mr. Blackman will result in substantial damages to him for which Mr. Blackman intends to hold you responsible. [JS 14–15.]

As of June 16, 1976, and at all pertinent times subsequent thereto, Flynt and Hustler Magazine, Inc., knew that Blackman was the creator of and owner of all rights to the photographs. Nonetheless, Flynt refused to return to Blackman the photographs left with Flynt on June 16 by Tucker. Instead, Hustler published 11 photographs of Elizabeth Ray in its September, 1976 issue and subsequently republished nine of those photographs in "The Best of Hustler # 2", and republished one Ray photograph in its July, 1979 anniversary issue. All of the photographs of Elizabeth Ray published in the September 1976 and July 1979 issues of Hustler Magazine and in

"The Best of Hustler # 2" were made and copied from transparencies, negatives and prints created by Blackman and obtained by Hustler from Tucker on June 16, 1976. Hustler did not identify Blackman as the copyright owner of any of the Elizabeth Ray photographs which it published in any of the three above-mentioned issues. JS 16–22.

In light of all these facts and others, this Court on July 11, 1984, 620 F.Supp. 792, concluded that

> with reason to believe its acts constituted infringement of copyrights, and in the absence of a license to do so, fully cognizant of plaintiff's rejection of its offer, Hustler willfully published Blackman's copyrighted photographs on three occasions. The first occasion occurred months after Blackman disavowed any contract. In an brash adventure with destiny, the second and third republications occurred after litigation had commenced....
>
> When Hustler elected to publish Blackman's photographs, it infringed Blackman's copyrights and acted in unfair competition.... Hustler's publications of these photographs were not inadvertent or accidental; they did not result from a misunderstanding. As Hustler acted in conscious disregard of Blackman's rights, its actions were deliberate, intentional, malicious and wanton. Mem.Op. at 30–33.

In sum, this Court found that Hustler made a "willful economic decision for which it must be held accountable." Mem.Op. at 32. That accounting is the task now at hand.

Because each of Hustler's three successive publications of the Elizabeth Ray photographs was issued at a different time and involved a distinct set-up and arrangement of copy, they shall be treated as three separate infringements for the purpose of assessing damages. *See L.A. Westermann Co. v. Dispatch Printing Co.,* 249 U.S. 100, 39 S.Ct. 194, 63 L.Ed. 499 (1919); *see also* 3 Nimmer, The Law of Copyright (hereinafter "Nimmer"), Section 14.04[E] at 37–42.1 (surveying cases invoking "time" test and "heterogeneity" test). Publication of the photographs in the September, 1976 issue and republication in Best of Hustler # 2 (published in late 1976) is governed by the Copyright Act of 1909, 17 U.S.C. § 1 *et seq.* (1970), which was in effect through 1977. The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (1977), applies to causes of action arising on or after January 1, 1978, and thus governs the republication in the July, 1979 Hustler issue. The damages provisions of the two statutes differ somewhat and will be discussed separately. Plaintiff's claim of unfair competition does not call for relief above and beyond that provided under the copyright statutes.

## A. *Damages Under the 1909 Act*

Under the 1909 Act, a prevailing plaintiff may recover damages equal to his actual damages suffered due to the infringement plus all the profits made by the defendant from the infringement. 17 U.S.C. § 101(b). In proving profits, the plaintiff is required to prove [revenues] only, and the defendant must prove every element of cost which he seeks to deduct from revenues. *Id.* Alternatively, the plaintiff may recover an award of statutory damages in lieu of actual damages and profits, in an amount appearing to the Court to be just, within certain limitations where applicable. *Id.*[1] Under the 1909 Act, the election between these alternatives is to a degree discretionary with the Court, and depends in large measure on the avail-

---

**1.** Plaintiff makes reference to the unusual rule in the United States Court of Appeals for the Second Circuit that a plaintiff may be entitled to recover *both* the defendant's profits and *statutory* damages. *See Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc.,* 329 F.2d 194 (2d Cir.1964); *see also Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,* 592 F.2d 651 (2d Cir.1978).

That rule, which curiously equates statutory damages with actual damages under the 1909 Act, is not the law in this Circuit and cannot be squared with the language of the statute. *See* 17 U.S.C. § 101(b) (statutory damages awardable "in lieu of actual damages *and* profits") (emphasis added); *see also* 4 Nimmer, Appendix 16 at 8.

ability of proof as to damages and profits. *See* 3 Nimmer § 14.04[A] at 23.

### 1. *Damage-Plus-Profit Recovery*

█ As actual damages, plaintiff seeks $10,000 representing the unpaid balance of his agreement with Cheri Magazine, which was lost when Hustler published the Ray photographs in its September, 1976 issue. In addition, he requests actual damages in the amount of $25,000 allegedly due to the reduction in the license value of the photographs caused by Hustler's wrongful publication of them and consequent saturation of the market and to Hustler's failure to identify Blackman as the creator and copyright owner of the photographs. In theory, each of these elements is recoverable under the 1909 Act. *See* 3 Nimmer § 14.02 at 10 and cases cited therein. However, the 1976 Act makes clear that a plaintiff's lost profits resulting from an infringement are not recoverable as actual damages to the extent that they have been taken into account in computing the defendant's profits, and vice versa. *See* 3 Nimmer § 14.01[B] at 5; *Taylor v. Meirick*, 712 F.2d 1112, 1120 (7th Cir.1983) (1976 Act). That rule is not made explicit in the 1909 Act, but the goal of preventing double recoveries applies equally to actions arising prior to 1977; therefore, the 1976 Act merely clarified but did not change the 1909 Act in this respect.

Defendant concedes that plaintiff has proven $10,000 in actual damages under the Cheri agreement, but argues that the "lost profits" sought by plaintiff as actual damages appear as defendant's profits under a damage-plus-profit recovery and should not be counted twice. Defendant further contends that the amount of lost profits claimed is highly speculative, given the absence of evidence documenting unsuccessful efforts by plaintiff to sell the Ray photographs to other buyers after the Hustler publication. Defendant also questions the significance of Hustler's failure to identify plaintiff as the photographer, in that plaintiff was himself an aggressive self-promoter: by his own assertion, when plaintiff first announced the existence of the pictures in mid-June, 1976, his telephone was "literally ringing off the hook" with calls from would-be purchasers. Tr. 186. At any rate, the dollar amount of actual damages in controversy is a relatively modest $15,000, since $10,000 has been conceded.

The profit element of the damage-plus-profit recovery formula raises a far more substantial issue. The statute contemplates that profits will be calculated by deducting costs proven by defendant from revenues proven by plaintiff. 17 U.S.C. § 101 (1970). Accordingly, as a first step each party has submitted its own calculation of revenues produced by the two infringing issues of Hustler governed by the 1909 Act.

| September, 1976 Issue | Plaintiff | | | Defendant |
|---|---|---|---|---|
| Advertising revenues | $ 377,921 | | | $ 26,471 |
| Distributor sales | 2,320,118 | | | 2,307,749 |
| Subscription sales | | $ 71,388 | (agreed) | |
| Archival sales | | 50,456 | (agreed) | |
| Direct sales and others | 1,252,917 | | | 29,250 |
| TOTAL: | $4,072,800 | | | $2,485,314 |
| **Best of Hustler #2** | | | | |
| Advertising revenues | 6,577 | | | -- |
| Distributor sales | | 1,525,703 | (agreed) | |
| Subscription sales | | none | (agreed) | |
| Archival sales | | 48,318 | (agreed) | |
| Direct sales and other | | none | (agreed) | |
| TOTAL: | $1,580,598 | | | $1,574,021 |

In making their calculations, the parties did not have the benefit of accurate financial data specific to the magazine issues in question. Through carelessness only partially explained but not excused by the rigors of a transcontinental relocation of defendant's corporate headquarters while this litigation was in progress, defendant has misplaced or destroyed documents critical to the revenue inquiry, including advertising receipts and rate sheets, print run tabulations, and the like. Consequently, plaintiff had no choice but to rely on the testimony of an expert economist, whose revenue estimates were based on the scanty information gleaned from Hustler through discovery. Plaintiff's expert had little familiarity with the magazine industry. Tr. 38–44. Barred from calling on its own chosen expert except as a fact witness, *see* Order of February 22, 1985,[2] defendant relied chiefly on audited aggregate financial data compiled for LFP, Inc., Hustler's parent corporation.

Drawing upon information in the LFP audited financial statement for 1976 (DX–AA), defendant argues that a reasonable estimate of advertising revenues for the September, 1976 issue is $1/12$ of the annual advertising revenues of $317,647, or $26,471. Plaintiff's expert ascertained more recent per-page advertising revenues for Hustler, adjusted that figure to account for post-1976 inflation as well as decreased circulation of the magazine, and arrived at a per-page revenue estimate for the September, 1976 issue. Multiplying that per-page estimate by 26.17 pages of advertising space in that issue (including some 16 pages of advertising placed by other LFP businesses), plaintiff's expert calculated that advertising revenues from the September, 1976 issue totalled $377,921, a figure higher than the *annual* advertising revenues shown on LFP's audited financial report. Tr. 55; Plaintiff' Post-Trial Mem. at 17. Some of the disparity is explained by the fact that plaintiff includes in his calculation the "value" of house ads run *at no charge* by other Flynt enterprises to fill unsold ad space in the magazine. However, even if the value-based house ad "revenues" are deducted from plaintiff's advertising revenue total, the remaining $146,864 exceeds defendant's figure by over $120,000. To a less dramatic degree, similar disputes drive apart the parties' advertising revenue estimates for Best of Hustler #2.

The above example is indicative of the problems engendered by defendant's loss of crucial documents: lacking specific contemporaneous data, the Court is hard pressed to determine whether plaintiff, defendant, or neither of them strikes close to the truth. An even more troublesome disparity in the parties' revenue figures concerns direct sales of the September, 1976 issue. The parties agree on the sale price of the issue; their dispute goes to the number of copies sold. Plaintiff relies on a June 17, 1976 article printed in the Las Vegas Sun Times newspaper (PX–28) as evidence that defendant printed and sold as many as a million copies of the September, 1976 issue above and beyond those accounted for. The Sun Times article reported that "Hustler ... [would] publish an additional million copies of the August issue" and quoted Flynt as stating, "We expect to

---

2. During discovery on the damages issue, defendant provided to plaintiff financial information prepared by Paul Miserendino (then an employee of Hustler) and produced Miserendino for deposition by plaintiff's counsel on December 20, 1984. Plaintiff prepared for trial on the understanding that Hustler would base its defense on Miserendino's calculations and would call him to testify to their accuracy at trial. On February 13, 1985, twelve days before the February 25, 1985 trial date, plaintiff's counsel learned through deposition testimony of Larry Flynt that Miserendino had been fired by Hustler shortly after his deposition. Defendant informed plaintiff's counsel on February 15, 1985 that it planned to call Arnold Levitt instead of Miserendino as a witness for the purpose of estimating Hustler's profits for the September, 1976 issue. Three days later, defendant advised plaintiff's counsel that Levitt would not base his testimony on the documents and methods of calculations employed by Miserendino. Upon plaintiff's motion for a preclusionary order, and in light of defendant's untimely disclosure, the Court ordered that Levitt be precluded from testifying as an expert witness, but did not limit his testimony as a fact witness. Order of Feb. 22, 1985.

sell out." PX–28. As the alleged million copies do not appear in defendant's archives, plaintiff reasons that they must have been sold. Defendant responds that no evidence produced at trial corroborates that prediction, which defendant regards as sheer puffery on Flynt's part. In the average case, the print run of a magazine can be easily determined by reference to the publisher's records, for instance, by examination of bills or statements issued from the printer it retains. In this case, it is virtually impossible to state with confidence that direct sale revenues from the September, 1976 issue amounted to the $1,252,917 asserted by plaintiff, the $29,250 claimed by defendant, or any figure between those two.

Even when the parties refer to the same source of information, their conclusions differ at times. For instance, a notation in the LFP audited financial statement for 1976 indicates a non-recurring loss of $4,017,503 in the event of a particular outcome of then-pending litigation between LFP and the distributor of Hustler at that time, Capital Distributing Company ("Capital"). That notation touched off a debate at trial as to the effect, if any, of the $4,017,503 "reserve" (see DX–AA, note D–1) on the tally of distributor sales reflected in Capital's final settlement for that issue. The dispute turns on whether the reserve represents potential liability of Hustler to Capital or potential liability of Capital to Hustler arising from the lawsuit. The language of the notation is unclear and plaintiff's expert witness offered flatly contradictory testimony on this point at trial. See Tr. 159, 167–71. For reasons that follow, this matter need not be resolved; it is raised only to demonstrate that even financial records referenced by both parties contain puzzling ambiguities.

On the question of publication costs deductible from expenses, the source of the parties' dispute is again defendant's failure to preserve pertinent documents. Because costs, unlike revenues, must be proven by defendant, the consequences of Hustler's cavalier disposal of records reflecting the expense of printing the magazine at issue fall squarely on defendant's shoulders. At trial, defendant could do no better than to produce evidence of Hustler Magazine's yearly profit margin for the year 1976, drawing from the annual financial data prepared for LFP, of which Hustler is one component. Conceding its inability to calculate profits on the basis of revenues minus costs, defendant submits that a fair estimate of the profits generated by the September, 1976 issue and Best of Hustler # 2 may be calculated by multiplying that issue's revenues by LFP's profit margin (a percentage figure) for that year. Based on a 19% overall profit margin for 1976 and defendant's calculation of revenues derived from the September, 1976 issue of Hustler ($2,485,314), defendant concedes earning a $472,210 profit from that issue. Applying the same 1976 profit margin (19%) to defendant's calculation of revenues derived from Best of Hustler # 2 ($1,574,021), defendant concedes profits from Best of Hustler # 2 in the amount of $299,064.

Plaintiff contends that defendant's profit margin method of calculating profits from the 1976 issues is unacceptable and does not satisfy defendant's burden of *proving* the costs of publishing the particular issues in question. Plaintiff cites support for equating profits and revenues where a defendant has not shouldered its burden of proving costs in a copyright infringement action, see *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 230, 73 S.Ct. 222, 224, 97 L.Ed. 276 (1952); *Russell v. Price,* 612 F.2d 1123, 1130–31 (9th Cir.), cert. denied sub nom. *Drebin v. Russell,* 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980), and on that authority argues that recoverable profits should equal that portion of gross revenues attributable to inclusion of the Ray photographs. Plaintiff's calculations of total profits and apportioned recoverable profits (those attributable to the Ray photographs) for the September, 1976 issue and Best of Hustler # 2, are shown and contrasted against defendant's figures below:

| September 1976 Issue | Plaintiff | Defendant |
|---|---|---|
| Revenues (from chart at p. 9) | $4,072,800 | $2,485,314 |
| Total Profits | 4,072,800 | 472,210 |
| Apportionment | x 80% | x 15% |
| Recoverable Profits | 3,258,240 | 70,832 |
| Best of Hustler #2 | | |
| Revenues (from chart at p. 9) | 1,580,598 | 1,574,021 |
| Total Profits | 1,580,598 | 299,064 |
| Apportionment | x 50% | x 15% |
| Recoverable Profits | 790,299 | 44,860 |

The disparity in the parties' calculations suggests—and the evidence produced at trial confirms—that an award based on plaintiff's actual damages plus profits (one basis of recovery under the 1909 Act) would be inappropriate in this case. Defendant is admittedly unable to establish the costs of publishing the isolated Hustler issues involved in this case. Nonetheless, it is clear that substantial costs were incurred and should be somehow accounted for—even those revenues conceded by defendant, not to mention those claimed by plaintiff, necessarily far exceed the profits generated by the two issues. Where costs have not been proven a court *may* equate profits with revenues; however, this case involves very high sums of money, and a revenue-based award would impose on defendant far too severe a penalty for its inability to document costs.

Defendant's profit margin method is an equally unacceptable method for determining profits recoverable under a damage-plus-profit award. The 19% 1976 profit margin figure derives from financial data covering all LFP enterprises (not just Hustler Magazine) over the entire year. Thus it does not account for the possibility that Hustler may have been more or less profitable than the other LFP components or that the issues in question may have generated more or less profit than other issues published in 1976. Given these flaws, the profit margin method, like plaintiff's method of calculating profits, is neither equitable nor based on fact. Accordingly, and in light of the absence of solid cost data, an award of statutory damages under the 1909 Act is more appropriate than a damage-plus-profit award.

### 2. *Statutory Damages*

Under the rubric of statutory damages (those awarded "in lieu of actual damages and profits", 17 U.S.C. § 101(b) (1970) ), the Court may award "such damages as ... shall appear to be just." *Id.* The statute also generally provides for a $5,000 maximum recovery per infringement; however, that limitation does not apply to infringements occurring after actual notice to a defendant. *Id.* In this case, Larry Flynt and Hustler Magazine received and ignored prior notice from Blackman and his counsel that publication of the Ray photographs would constitute copyright infringement. Accordingly, statutory damages in any appropriate amount can be assessed.

In determining an appropriate amount, the Court may follow the $1-per-infringing-copy guideline provided in the statute but retains discretion to award a lesser amount in the interests of justice. *See Fedtro, Inc. v. Kravex Mfg. Corp.*, 313 F.Supp. 990 (E.D.N.Y.1970) (yardstick measure of two cents per page applied); 4 Nimmer, Appendix 17 at 2 (yardstick measure "purely discretionary" and "often departed from by courts"). Using either party's tally of copies printed, the $1-per-copy guideline would yield a multimillion-dollar recovery for plaintiff for the 1976 issues alone. Such an award, like the revenue-based award rejected above, is excessive. Moreover, resort to a plainly arbitrary method of setting damages is unnecessary and illadvised here, as the evidence presented at trial may be drawn upon in an effort to ascertain a more realistic amount of damages.

As discussed above, the available evidence bearing on damages is imperfect and incomplete. Nonetheless, the Court finds useful, for present purposes, defendant's calculations that its revenues from the September, 1976 issue and Best of Hustler # 2 amount to $2,485,314 and $1,574,021, respectively. Defendant *concedes* that 19% of those revenues (or $472,210 and $299,-

064, for the respective issues) constitutes profits. Therefore, at least a sizeable (unapportioned) profit figure is not in dispute, and, as shown below, the undisputed profits, when properly apportioned and added to proven damages, yield a just and reasonable statutory damage award.

Defendant advocates apportioning profits from both 1976 issues on a 15% basis, and offers both statistics and arguments to support its position. To the extent that defendant simply contrasts the *number* of pages and photographs per issue against the *number* of pages devoted to the Ray photographs and the *number* of plaintiff's photographs included in the magazine, its approach unconvincingly assigns equal revenue-generating value to every page and photograph, regardless of content. Defendant's contention that the issues containing Ray photographs did not appreciably outsell other 1976 issues is equally insubstantial: that argument addresses revenue apportionment between issues published in 1976 and only tangentially bears on apportionment between features within a single issue.

Based on Hustler's own treatment of the infringing material—*i.e.*, the use of the Ray photographs as a lure to attract readers, the fostering of publicity focusing on their publication, and the placement of the Ray photographs in the magazine—it is clear that plaintiff's photographs were the highlight of the September, 1976 issue and a prominent part of Best of Hustler # 2. A realistic estimate is that their unauthorized publication generated 60% of the September, 1976 issue's profits and 35% of the profits of Best of Hustler # 2. Those apportionments, while well above defendant's 15%-per-issue conservative estimates, fall far short of the overly generous 80% and 50% apportionments proposed by plaintiff.

■ When applied to conceded gross profits, the 60% and 35% apportionment estimates yield recoverable profit figures in the amount of $283,326 for the September, 1976 issue and $104,672 for Best of Hustler # 2. Recognizing that neither party has *proven* the underpinnings of these

calculations, the Court nonetheless determines that, with respect to the 1976 issues, a total of $397,998 represents a fair recovery which will amply compensate plaintiff for his losses (including the loss of $10,000 under the Cheri contract), strip defendant of its ill-gotten gains and discourage similar actions by defendant in the future. *See generally, F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276 (1952) ("lack of adequate proof [as to damages or profits] warrant[s] resort to the statute in the discretion of the court", and statutory rule "not merely compels restitution of profit and reparation for injury but is designed to discourage wrongful conduct:); *United Feature Syndicate, Inc. v. Sunrise Mold Co.*, 569 F.Supp. 1475 (D.Fla.1983) (addressing restitution, reparation and deterrence functions of statutory damage award under 1976 Act). Whether a damage-plus-profit recovery would have been higher (as plaintiff claims) or lower (as defendant contends) need not be determined. Under the statute, it will suffice that, upon consideration of the entire record, the amount awarded in the discretion of the Court is just and reasonably designed to accomplish the purposes of the statute.

### B. Damages Under the 1976 Act

■ Defendant's infringing republication of the Ray photographs in its July, 1979 fifth anniversary issue is governed by the current copyright act, 17 U.S.C. § 101 *et seq.* (1977), ("the 1976 Act"). The 1976 Act, like the 1909 Act, provides that a plaintiff may recover either actual damages plus profits or statutory damages, 17 U.S.C. § 504. Under the 1976 Act, the election between alternatives is clearly left to the plaintiff, who in this case has deferred to the Court's discretion on this matter. *See Harris v. Emus Records Corp.*, 734 F.2d 1329 (9th Cir.1984) (under the 1976 Act, election is prerogative of plaintiff, whether or not there is adequate evidence of actual damage or profits).

■ The parties have stipulated as to all elements of revenues generated by the

July, 1979 issue except advertising revenues. As before, plaintiff contends that whether or not payments for house advertising space were actually passed between the various Flynt enterprises, the value of house ad space should be accounted for in this action at the same rate as space actually sold to outside advertisers. Defendant responds that house ads produce no revenue for Hustler, and that the magazine's inability to sell (and outside advertisers' unwillingness to pay for) house ad space indicates that it is valueless as a revenue source. Defendant's argument is the more persuasive; therefore, defendant has properly included in its accounting of advertising revenues only those monies actually paid into Hustler's coffers by purchasers of ad space in 'the magazine. Accordingly, defendant's gross revenues calculation of $2,809,351 is accepted as accurate.

The parties have stipulated that the deductible cost to defendant of publishing the July, 1979 issue totalled $1,680,000. JS 47. Subtracting costs from revenue yields an unapportioned profit total of $1,129,351, only part of which may be fairly attributed to the infringing materials. Plaintiff acknowledges that the Ray photographs comprise only a small portion of the 1979 issue and proposes a 5% apportionment. Defendant argues that half of that (2.5%) is appropriate. In consideration of both parties' arguments and the fact that the newsworthiness of the Ray photographs had diminished considerably by 1979, the Court finds a 3% apportionment to be reasonable. Three percent of the demonstrated profits of $1,129,351 equals $33,881 in profits attributable to the infringement. Plaintiff does not claim that the 1979 republication caused him to suffer *additional* actual damages, and the actual damages resulting from the original publication have been accounted for in the statutory damage award with respect to the 1976 issues. Therefore, as to the July, 1979 infringement only, a damage-plus-profit recovery of $33,881 is appropriate and shall be awarded.

### C. *Other Elements of Recovery*

Plaintiff requests that his recovery be increased to adjust for inflation during the period between the filing of the suit and judgment; in addition, he seeks prejudgment interest and punitive damages. None of these elements is traditionally included in a copyright infringement award, and none will be granted in this case. *See* 3 Nimmer § 14.02 at 10–11 (prejudgment interest "occasionally" awarded in copyright infringement actions); *see also Aitken v. Empire Constr. Co.*, 542 F.Supp. 252 (D.Nebr.1982); *Baldwin Cooke Co. v. Keith Clark, Inc.*, 420 F.Supp. 404 (N.D.Ill. 1976) (denying prejudgment interest on damage-plus-profit award); *Davis v. E.I. du Pont de Nemours & Co.*, 257 F.Supp. 729 (S.D.N.Y.1966) (denying prejudgment interest on statutory damage award). *See also* 3 Nimmer § 14.02 at 12 and cases at nn. 40–41 therein ("it is, in any event, clear that exemplary or punitive damages should not be awarded in a statutory copyright infringement action" as opposed to common-law action, because policy rationale of punishing and preventing malicious conduct can be accounted for in provisions for increasing or disregarding maximum limits on statutory damage award).

The availability of costs and attorney's fees (both of which are sought by plaintiff) under the 1909 Act and the 1976 Act has been addressed by this Court in *Quinto v. Legal Times of Washington*, 511 F.Supp. 579, 580 (D.D.C.1981):

Section 505 [of the 1976 Act] provides as follows:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

This represents a substantial departure from the 1909 Copyright Act. Under the old law, 17 U.S.C. § 116, it was mandatory that full costs be awarded to the prevailing party in a copyright infringement action while attorney's fees were discretionary. The new Act leaves both matters to the court's discretion.

*See also* 3 Nimmer § 14.09 at 62; *Encyclopedia Britannica Educational Corp. v. Crooks,* 558 F.Supp. 1247 (W.D.N.Y.1983). The *Quinto* court summarized the rationale for an award of attorney's fees as follows:

> An award of attorney's fees helps to ensure that all litigants have equal access to the courts to vindicate their statutory rights. It also prevents copyright infringements from going unchallenged where the commercial value of the infringed work is small and there is no economic incentive to challenge an infringement through expensive litigation.... In addition, an award of attorney's fees serves to penalize the losing party as well as to compensate the prevailing party.

511 F.Supp. at 581; *see also Oboler v. Goldin,* 714 F.2d 211, 213 (2d Cir.1983); 3 Nimmer § 14.10 at 64.

With these objectives in mind, and in light of Larry Flynt's "deliberate, intentional, malicious and wanton" disregard of plaintiff's rights, Mem.Op. at 33, and defendant's conduct throughout this litigation, an award of attorney's fees and costs is appropriate in this case. *See Lauratex Textile Corp. v. Allton Knitting Mills,* 517 F.Supp. 900 (S.D.N.Y.1981) (willfulness of infringement justifies attorney's fees). It has been stipulated that the expenses and hours reflected in defendant's submissions (see Exh. 35 and supplements thereto) are accurate and were incurred solely in this litigation. Defendant has not stipulated to the reasonableness of the hours expended, and under both Copyright Acts only reasonable attorney's fees are authorized. 17 U.S.C. § 116 (1970); 17 U.S.C. § 505 (1977). The requisite reasonableness is gauged by the amount of work necessary, the amount of work done, the skill employed, monetary amount involved, and result achieved. *See* 3 Nimmer § 14.-10[D] at 71; *see generally Quinto v. Legal Times of Washington, Inc., supra; Cloth v. Hyman,* 146 F.Supp. 185 (S.D.N.Y.1956).

Plaintiff has painstakingly accounted for every element of cost and each attorney-hour spent on this case by an associate or junior partner in plaintiff's counsel's law firm since January, 1981. However, there is no itemization of charges billed to plaintiff's account up to December 31, 1980, such charges in the amount of $43,332.50 being reflected as "unbilled balance" on the billing summary submitted to the Court. Likewise, there is absolutely no explanation for the hours spent by plaintiff's lead counsel, although attorney fees attributable to his legal services amount to $28,250. It is unclear whether the statement of expenses incurred by Robert R. Nathan Associates submitted with plaintiff's original Exhibit 35 are now contained in the updated Exhibit 35. Accordingly attorney's fees will not be awarded at this time, but counsel for plaintiff is invited to submit a post-judgment attorney's fees application, within 20 days of this date, with supporting documentation responsive to the Court's concerns above.

A separate Judgment accompanies this Memorandum Opinion.

### JUDGMENT

Judgment is hereby entered in favor of plaintiff Barry M. Blackman and against defendant Hustler Magazine, Inc., in the amount of $431,879, itemized as follows:

| | |
|---|---|
| Damages under 17 U.S.C. § 1 *et seq.* (1970) (Copyright Act of 1909) and common law of unfair competition | $397,998 |
| Damages under 17 U.S.C. § 101 *et seq.* (1977) (Copyright Act of 1976) and common law of unfair competition | 33,881 |
| Total | $431,879 |