BUSINESS TRENDS ANALYSTS, INC., Plaintiff,

v.

The FREEDONIA GROUP, INC. and the Freedonia Group, Incorporated, Defendants.

No. 86 Civ. 3540 (KC).

United States District Court, S.D. New York.

Oct. 19, 1988.

As Corrected Oct. 27, 1988.

Opinion On Motion to Amend Dec. 27, 1988.

Michael Cornacchia and John Ciarelli, Ciarelli, Dempsey & Cornacchia, Melville, N.Y., for plaintiff.

James L. Stengel and Jeff Conciatoni, Donovan, Leisure, Newton & Irvine, New York City, for defendants.

**1216**

### JUDGMENT AND ORDER *

CONBOY, District Judge:

Plaintiff in this case complains that its copyrighted study on the Robotics Industry has been infringed by defendants, who published a study of the same industry. Plaintiff also claims that its customer list, asserted to be a trade secret, was unlawfully appropriated and used by defendants; that defendants in violation of the Lanham Act, palmed off their studies of various industries as being connected with, related to or derived from plaintiff's predecessor in interest; and that defendants engaged in unfair competition under New York common law, in that they engaged in certain predatory practices designed to deceive potential customers about the source of their studies.

With respect to the principal claim of copyright infringement, defendants concede access to plaintiff's report, but deny any substantial similarity as to protected expression. Defendants deny the non-copyright claims. The late Honorable Edward Weinfeld denied plaintiff's motion for a preliminary injunction and granted defendants' motion for dismissal of certain other claims on January 5, 1987. *Business Trends Analysts, Inc. v. The Freedonia Group, Inc.*, 650 F.Supp. 1452 (S.D.N.Y. 1987). This Court conducted a nonjury trial which concluded on March 21, 1988 and post-trial briefs were submitted on June 10, 1988. The following constitutes the Court's findings of fact and conclusions of law.

### I. BACKGROUND

Plaintiff Business Trend Analysts, Inc. ("BTA"), suing herein as Business Trends Analysts, Inc., is a New York Corporation with its principal place of business in Commack, New York. Since its formation, BTA has been a marketing and research firm engaged primarily in the business of publishing reports on industries or selected groups of industries. Tr. 495; DX SSS (Ritchie Deposition Excerpts) at 14.

The Freedonia Group, Inc. and The Freedonia Group, Incorporated ("Defendants") are Ohio corporations. The Freedonia Group, Inc. is not presently an active corporation, having been dissolved several years ago. Tr. 344. The Freedonia Group, Incorporated ("TFG") was incorporated on April 25, 1985 and has its principal place of business in Cleveland Heights, Ohio. Tr. 66; Answer, ¶ 3. TFG is engaged, among other things, in the business of creating and marketing comprehensive economic and marketing research reports on various industries ("industry studies").

Since the early 1960s and until January 1, 1985, Predicasts, Inc., an Ohio company with its principal place of business in Cleveland, Ohio ("Predicasts"), was engaged in the business of publishing industry studies. Tr. 21–22. By agreement effective January 1, 1985 ("the Agency Agreement") (PX 3), Predicasts licensed BTA to be its exclusive sales representative through 1989 for approximately 90 specified industry studies previously published by Predicasts. Pursuant to the Agency Agreement, BTA acquired Predicasts' existing inventory of those studies along with the right to market them under the Predicasts name. The titles of the studies licensed to BTA were set forth on Schedule A to the Agency Agreement. One of the included studies is the Predicasts report on the robotics industry. BTA did not receive rights in any studies other than those specified in Schedule A, nor did it acquire rights in any other Predicasts' product line. Tr. 42. BTA paid Predicasts $300,000 for the license and agreed to pay Predicasts a royalty based upon sales of the licensed studies. PX 17; Tr. 498.

As required by the terms of the Agency Agreement, Predicasts notified its customers by letter dated March 27, 1985 that BTA had been appointed to be the exclusive worldwide distributor of Predicasts' industry studies, and that BTA would handle the fulfillment of all orders, answer all research questions and provide any additional information about those studies. DX R; Tr. 514.

---

* This is a corrected version of the court's Judgment and Order dated October 19, 1988.

William Weiss is the co-founder and president of TFG. From 1964 to the spring of 1982, Mr. Weiss was employed at Predicasts, and from 1964 to 1980, he was its Executive Vice–President with responsibility for research products (including industry studies) and marketing. In November of 1980, Predicasts was acquired by Thyssen–Bornemisza ("TB"), at which time Mr. Weiss entered into a five-year employment agreement with TB. Tr. 954–55. In late 1981, he assumed the position of President of the Predicasts Research Group, and as such was responsible for the preparation of Predicasts' industry studies. In the spring of 1982, Mr. Weiss terminated his employment relationship with Predicasts. Tr. 954.

In or about October 1984, the Predicasts Research Group withdrew from the industry study business. T. Kevin Swift and Robert Baumgartner, employees, left the firm shortly thereafter.

When Mr. Swift resigned his employment with Predicasts, he took with him a computer printout listing of customers for a Predicasts' publication called the "Predicasts Composite Forecast Service." He obtained this list (PX 9) from the Predicasts systems division. Tr. 380, 586. At his "exit interview," he discussed the list with Mike Janovic, then Vice–President of Predicasts' Research Service, and Thomas Bergess, the Director of Employee Relations. Messrs. Janovic and Burgess were both aware that Mr. Swift had a copy of this list, that he would be taking it with him when he left Predicasts, and that he intended to seek employment with a competitor of Predicasts. Predicasts apparently placed no restriction on Mr. Swift's use of the list, nor did it request that he return it to the company. Tr. 881–82.

On or about December 18, 1984, Predicasts published an industry study entitled *3547 Robotics (Markets and Competitors)* ("the Predicasts Robotics Study" or "plaintiff's study") (PX 1) the allegedly infringed study herein. Neil Digeronimo, a Predicasts employee, was the author of this work. Predicasts applied to the United States Copyright Office for federal copyright registration on the Predicasts Robot-

ics Study on November 25, 1985. A certificate of registration was issued bearing the effective date of November 25, 1985 (TX 1–699–835) (PX 2). Pursuant to the Agency Agreement, BTA was licensed to distribute the Predicasts Robotics Study. A memorandum setting forth this license, executed by Richard M. Harris, President of Predicasts, on March 14, 1986, was recorded in the Copyright Office on March 27, 1986. PX 4.

In early 1985, Mr. Weiss, and Messrs. Swift and Baumgartner formed TFG market industry studies. It began operations on or about May 20, 1985. Tr. 605; DX RRR (Baumgartner Deposition Excerpts) at 23–27. TFG hired several former employees of the Predicasts Research Group, one of whom, Ms. Andrea Fetsko–Louie, was an active employee of Predicasts at the time that she was hired by TFG.

In or about August 1985, TFG first offered for sale an industry study entitled *Industry Study 113: Robotics* ("the TFG Robotics Study" or "defendants' study") (PX 5), the allegedly infringing work herein. It was principally authored by Mr. Swift, Tr. 756, who was TFG's Vice–President of Research. Tr. 703. He was assisted in the preparation of this study by Ms. Fetsko–Louie. Tr. 677.

Mr. Swift and Ms. Fetsko–Louie both had access to and referred to the Predicasts Robotics Study in the course of their work on TFG's study. Mr. Swift referred to plaintiff's study in August 1985, while he was researching the background of the robotics industry for his study. Tr. 623–27, 672–73. Ms. Fetsko–Louie also used the Predicasts Robotics Study in connection with the preparation of the TFG Robotics Study. Tr. 534–35.

In November 1985, TFG sent out a mailing piece announcing that it was accepting orders for 15 completed studies, including the "TFG Robotics Study," and 11 other works in progress. The price of each of those studies was $1,500. PX 14.

The average price of a TFG industry study is approximately $1500, Tr. 399; PX 14, the same average price for a Predicasts' industry study. Tr. 23.

In January 1986, in order to enhance its competitive position, TFG mailed out a promotional brochure introducing a special, limited offer of three studies for $150 each. PX 16. The studies covered three subjects: robotics, plastic pipe and biotechnology. The purpose of this special introductory discount was to improve TFG's customer base by getting TFG industry studies into the hands of qualified buyers. Tr. 417. This discount was available for two or three months, at which time the price of those studies was returned to $1500, the price of the other studies offered for sale in the TFG catalogue. Tr. 417–19.

Industry studies are typically sold by telephone or mail order and not over-the-counter. As a result, potential purchasers do not actually see the studies themselves until after purchase, and the appearance of the studies themselves are generally not a factor in purchasing decisions. Even if it were, however, the "trade dress" of TFG's industry studies is and at all relevant times has been different and distinct from that of the Predicasts' industry studies sold by BTA. *See, e.g.,* PX 1; PX 5. Since 1982, BTA's Predicasts industry studies have been marketed in brown leatherette covers. In addition, the "Predicasts" logo has appeared on every page of the studies. In contrast, the TFG industry studies have been and continue to be marketed in grey plastic covers with the company name, business address and distinctive "TFG" logo prominently displayed on the cover page. BTA's president conceded at the trial that there is no resemblance between the TFG and Predicasts logos. Tr. 985.

"Composite Forecasts" were prepared and distributed by Predicasts to subscribers as part of a quarterly publication called "Predicasts Forecasts." This was substantially and functionally a different service from single industry studies. Tr. 33. BTA has never been in the composite forecast business and did not obtain any rights to Predicasts' composite forecast business or receive any lists or sales records relating thereto under the terms of the Agency Agreement. Tr. 489.

Predicasts' customer lists were freely and widely available within the Predicasts organization. There was no policy at Predicasts designating such lists as "confidential". Tr. 44; DX QQQ (Potts Deposition Excerpts) at 12–13. No special procedures, written or otherwise, existed at Predicasts to maintain the confidentiality of its customer lists. DX QQQ at 12–13, 27–28, 40–41. When discarded, Predicasts' customer lists were often left in hallways, on loading docks and in trash containers outside the Predicasts offices. DX QQQ at 18, 40–41; Tr. 47–48.

Predicasts did not instruct or otherwise communicate to its employees any policy regarding the confidentiality of its customer lists. DX QQQ at 40–41; Tr. 44. Predicasts' customer lists were available to employees on request, and no signout or return procedure was used. DX QQQ at 12–13, 26–27, 40–41. Many Predicasts employees who were not subject to written employment agreements had access to its customer lists. DX QQQ at 12–13, 26–28, 40–41.

Predicasts did not consider its industry studies to be trade secrets and did not treat them as such. DX NNN at 54–55.

## II. THE COPYRIGHT CLAIM

### A) *The Rival Robotics Studies*

■ Plaintiff's study bears a publication date of December 1984 and is 116 pages in length. Defendants' study bears a publication date of October, 1985 and is 113 pages in length. Plaintiff's table of contents divides its study into five sections, followed by a list of tables (26 in number). Defendant's table of contents divides its study into a two paragraph introduction, and five sections, followed by a list of tables (34 in number, plus 13 charts).

In fully reading these reports, it is apparent that when discussing highly generalized aspects of economic conditions, historical development and trends in industrial automation, and the role of government in the industrial arena, defendants' report is similar, though not substantially similar, to plaintiff's report. It is when the discussion becomes specifically focused upon the phe-

nomenon, characteristics, utility and potential of robots, and more to the point, of particular kinds of robots, that the issue of substantial similarity is decisively raised.

But before reviewing the texts on concrete and specific claims of verbatim copying or paraphrasing so close as to amount to verbatim copying, some general observations on the content of the reports are appropriate. The reports, when read as a whole, cover in broad effect the same ground. Although treatment of certain areas, such as, for example, new plan expenditures for robots in plaintiff's report (PX 1 p. 15–16) and determinants of demand for robots in defendant's report (PX 5, p. 11–14) do reveal some differences, others, more numerous, reveal marked similarities. This is the case, for example, with plaintiff's discussion of the legal and regulatory environment for robots (PX. 1, p. 17–19) and defendants' section on regulatory considerations for robots (PX. 5, p. 22–23). The strength and dimension of similarity increases as the topic, element or factor discussed increases in technical or theoretical substance. Compare, for example, the technology trends section in plaintiff's study (PX 1, p. 54–66) and the technology subsection in defendants' report (PX 5, p. 14–18). Most decisively, this process is evident in the comparison treatments of industrial robots by end use application found in plaintiff's report (PX 1, p. 20–54) and defendants' report (PX 5, p. 32–48). The Court concludes, based upon a full review of the reports, the exhibits received at the trial, and the testimony of the authors, that these technology and robot end-use application review sections, with the industry structure and profiles of leading competitors, to be next considered, are the portions of the reports that most gave them value.

A striking similarity in both reports is evident when one examines the compilation of companies in plaintiff's *Profiles of Leading Competitors* (PX 1, p. 84–114), and in defendants' *Company Profiles* (PX 5, p. 71–110). All fifty-seven companies listed and profiled in plaintiff's report are also listed and profiled in defendants' report. While plaintiff's author does not assert that the contents of the profiles are original with him, he does claim that the assembly of the list is original, and that his research in organizing the material is entitled to protection. A side by side comparison of the company profiles demonstrates that the listings are virtually identical, and the contents of numerous profiles are strikingly similar in both reports. PX 19, p. 19–40.

B) *The Testimony of the Authors*

Neil Digeronimo, the author of plaintiff's report, is a marketing research consultant, who worked for Predicasts for three years and was manager of its high technology research division. Tr. 59. He wrote fourteen high technology industry studies while at Predicasts. Tr. 60. He began working on his robotics study in September, 1984 and finished it two months later, in December, 1984, having put in 400 hours of personal effort. Tr. 63. He testified that in the spring of 1985 he received an invitation from Mr. Weiss to join TFG to write a robotics study, and that Mr. Weiss told him "if I don't hear from you in a couple of weeks, I will have Kevin [Swift] reconstruct one." Tr. 67.

Mr. Digeronimo had written a prior robotics study for Predicasts in 1981. In the summer of 1984 he went to a Robotics Industry trade show conference in Detroit and contacted every exhibitor there, then he talked to individual company representatives, after which he returned to Cleveland and did the literature searches. This involved reviewing abstract trade journals, doing secondary research on the literature and pursuing critical opinion and product announcements of companies. Tr. 70. In his view, the key components of the study are market segmentation by end use application, and industry structure. Tr. 72. His computer background allowed him to write authoritatively on CAD and CAM technology. Tr. 75. The industry structure section, selecting the robotics company profiles, was based exclusively upon his opinion, and was not in any way derivative from other compilations. Tr. 77–78.

Mr. Digeronimo asserted that he "decided to come up with four categories that

place different types of robots into different convenient headings so they could be looked at as a business opportunity ... coating, welding, material handling and processing." Tr. 111. He also said that he had coined the term processing robots, to embrace parts finishing, assembly and inspection robots, in 1981–82. Tr. 128.

With respect to the compilation of his listing of leading competitors, Mr. Digeronimo said that he selected them on the combined basis of his discussions with producers or marketers, his review of product literature and other trade data, and personal insight into market share, technology or unique characteristics. Tr. 143–44. He pointed out his listing description for IBM, noting that he had listed, randomly, a number of firms IBM has value added marketing agreements with, and observed that these same firms appear in defendants' profile of IBM. Tr. 145. On the subject of foreign competitors appearing in the compilations of both studies, he stated that there are "several hundred Japanese competitors, not all of which are listed as marketing in the United States. Many more than the ones I have here. These are presented in the TFG study in the same random order these were put in [in my study] ... Probably the best rationale behind [my selection] was that these particular companies provided product literature to me so I had something to go on" Tr. 148.

Thomas Kevin Swift, the author of defendants' report, has a graduate degree in Economics, and is one of the founders of TFG and its Vice President for research. Tr. 694, 666. Prior to being employed by TFG, he worked for five years at Predicasts, where he authored fifteen industry studies, and became director of research services. Tr. 569, 701. While at Predicasts, he was Mr. Digeronimo's supervisor, Tr. 594, personally assigned Mr. Digeronimo to write the 1984 Predicasts study on robotics, Tr. 880, and met with him in August or September, 1984 to outline the study. Tr. 879.

In January, 1985 after both Messrs. Digeronimo and Swift had left Predicasts, Mr. Swift was shown a copy of Mr. Diger-onimo's completed study by its author. Tr. 598, 669. He saw it again in June, 1985 at TFG's offices, where he was then employed, and reviewed it at his TFG office in August, 1985 in connection with the preparation of his own robotics study. Tr. 620, 623, 669. He testified that he looked at it in August, 1985 "because [he was] going to begin to write [his] own robotics study." He denied taking *any* notes, (emphasis added), Tr. 673. When shown a photocopy of plaintiff's study (PX 6) with hand markings and notations thereon, concededly found in TFG's files, Mr. Swift denied seeing the markings and notations until after his study was completed, Tr. 721, denied that he made any of the markings or notations, Tr. 719, 721, 722, denied knowing who put the markings on the photocopy, Tr. 677, and initially denied knowing if any of the markings or notations had been put there by his subordinate, Ms. Andrea Fetsko–Louie, Tr. 748. When questioned directly by the Court on the matter, he admitted the handwriting was that of his assistant. The relevant examination appears in the Trial Transcript at pages 748–749:

Q. Can you go to page 111 of the marked study. Do you see the words next to Sormel S.A. at the lower left-hand part of the page?

A. Yes.

Q. Do you see them there?

A. Yes.

Q. What do they say?

A. I think it says "Start here."

Q. Did you place those words there?

A. No.

Q. Did Ms. Louie?

A. I don't know.

Q. Were these words, if you know, a direction to a person in connection with the use of this study at TFG?

A. No, I don't know that.

Q. Could you go to page 112, please.

THE COURT: Just so we are clear on this with respect to page 111, Mr. Swift, that you just referred to, you indicated that the phrase in the left-hand margin "start

here" was not placed by you, is that correct?

THE WITNESS: That's correct.

THE COURT: Was the phrase "not there—delete from profile", was this placed there by you?

THE WITNESS: No.

THE COURT: Do these appear to be the same handwriting?

THE WITNESS: Yes.

THE COURT: Do you recognize either handwriting?

THE WITNESS: I do now.

THE COURT: Whose handwriting is it?

THE WITNESS: Andrea Louie's.

THE COURT: Both notations were done by her?

THE WITNESS: I don't know if they were done by her but it looks like her handwriting.

Q. Do you see any other handwriting of Andrea's in this marked copy that we have gone through?

A. On which page?

Q. Any page we have gone through?

A. Yes. I would recognize some of it as her handwriting.

Q. And it is her handwriting?

A. Yes.

Mr. Swift insisted that he did not know whether the notation "start here" on page 111 of the photocopy mark-up of the Predicasts' report was an editorial or typing direction made in connection with the preparation of the TFG report. Tr. 748. He did concede that the notation "DEL" on page 110 stands for "delete", and is an editorial comment. Tr. 748.

The witness was examined at length on PX 19, containing a side by side comparison of approximately three dozen paragraphs and numerous charts, tables and the profile compilations in both works. Mr. Swift's position, when confronted with sections or passages of often striking similarity, was consistently along the lines that he may have read plaintiff's passage, or he doesn't remember reading plaintiff's passage, but

that he categorically and emphatically denies using the plaintiff's expression. Two of many examples of this may be found at Tr. 756–758 and Tr. 758–759. The thrust of this author's testimony is that he did no copying of any kind from plaintiff's study, irrespective of whether similar material from plaintiff's report is protected matter.

This is an amazing, and simply untenable position, in light of the broad similarities in the text of the two reports, as will be evident from the textual comparison the Court will shortly undertake.

With respect to the testimony of Mr. Swift, the Court need only further note that on the technical question, in both reports, as to whether a feedback loop is a servo mechanism, the witness conceded a common error. Tr. 759–763. Interestingly, the witness characterized the common error as inhering in a faulty *expression* of an idea (emphasis added): "it is not worded correctly." Tr. 762–63.

On the basis of the full record, Mr. Swift's repeated assertion, throughout his testimony, that he appropriated no part of Mr. Digeronimo's expression, is not credible.

### C) *The Accused Passages*

Plaintiff has cited thirty-three passages in the defendants' report which it claims are instances of either verbatim copying from or paraphrasing of such striking resemblance to passages in its report that, taken in the aggregate, these passages constitute an adequate basis to establish substantial similarity between the two works and an infringement of its copyrighted report. (PX 19, p. 1–40) The cited passages are generally paragraphs which variously contain statements of pure fact and statements of mixed pure fact and subjective assessment. Of course, only originality of expression, and not facts, ideas or conclusions in themselves, can be the subject of copyright protection. Ideas or conclusions embrace, of course, business assessments and economic forecasts.

A review of a number of the accused passages follows, which are representative of the passages as a group.

In the discussion of modern CAD technology (PX 19, p. 1) the plaintiff's report says:

> Modern CAD uses analytical software to conduct the analyses and utilizes its graphic capabilities to represent the results pictorially rather than numerically. Recent innovations and continuing developments which facilitate the design process are color, 3–dimensional views, hidden line removal, solid modeling, and texture representation.

The defendants' report says:

> Modern CAD technology employs analytical software to conduct the design analysis (iterations of formulae, modeling, simulation, etc.) and utilizes its inherent capabilities to present the results graphically. Recent innovations in the latter include color, 3–dimensional views, hidden line removal, solid modeling and texture representation. The second function of CAD is the generation of production engineering drawings of physical structures, parts or components. As automation proceeds, the need for engineering drawings will be diminshed as the basic design information, required schedules and instructions will be communicated electronically to the host manufacturing computer.

It is quite apparent that plaintiff's entire idea, as expressed through original choice of vocabulary, sentence structure, organization and precise content, has been lifted in its entirety and placed, rather illogically, ahead of defendants' "second function" idea, implying that two separate CAD functions are being discussed, when in fact the "second" is only a restatement of the first.

On the subject of CAM technology (PX. 19, p. 1) the plaintiff's report says:

> CAM technology also originated in the 1950s. Automation of the planning and scheduling, and inventory management functions were developing in bits and pieces. Planning and scheduling was simplified by computerized CPM (critical path model) and PERT (program evaluation and review techniques), and inventory management developed EOQ (economic ordering quantities) and MRP (materials requirement planning) techniques. CAM of the 1980's will use elements of all the above systems in an approach called MRPII (manufacturing resource planning). During the time that material and schedule management was evolving, fabrication management was also developing. NC is well established in manufacturing today and has become computerized.

The defendants' report says:

> Like CAD, CAM technologies arose in the 1950's and 1960's as planning and scheduling were automated in bits and pieces by the computerization of CPM (critical path model) and PERT (program evaluation and review techniques) and as inventory management techniques such as EOQ (economic ordering quantities) and MRP (material resource planning) were developed. Current CAM technology is incorporating elements of the above systems in an approach called MRPII (manufacturing resource planning). Within CIM, elements of CAM will entail the direction of production machinery without the intervention of a human operator. Only a handful of manufacturing systems have achieved this degree of sophistication although Integraph and GMF Robotics are developing the software that will eventually enable the programming GMF robots on an Integraph CAD/CAM workstation, transfer the program to the CIM host and direct the CIM host when needed. In fact, General Motors now requires that all robots, machine tools, computers and other factory automation equipment used must conform to the automakers's Manufacturing Automation Protocol (MAP).

Here again it is readily apparent that most of the original expression of plaintiff's idea about the development, both historically and functionally, of CAM technology, has been taken on a virtually verbatim basis by the defendants, and inserted in their passage. That defendants did not take the entire passage of plaintiff does not avail them. Furthermore, although plaintiff's

exhibit 19 does not demonstrate it, a reading of the last paragraph of page 56 (continued on page 57) of plaintiff's report reveals that the expression of ideas about CIM in general and GMF robotics in particular in the remainder of defendant's passage, was also appropriated from plaintiff's report.

In a discussion of pneumatic, hydraulic and electrical drive systems (PX. 19, p. 2) plaintiff's report says:

> Drive systems can be pneumatic, hydraulic or electrical. Although most robots use only one of the three systems, robots that use two or all three drive systems have been built. For example, a robot may use hydraulics to move the heavy arm but electrical motors to activate the gripper.
>
> Pneumatic systems are most common in low cost robots and are found in about 30% of all robots in use. The main advantages to pneumatic drives are low initial cost and high reliability, which is reflected in low maintenance cost. One of the disadvantages of pneumatics is poor speed and position controls which makes this drive system adequate for only limited sequence applications.
>
> Electrical—or more accurately, electronmechanical drives—are used in about 25% of all robots in use. One of the advantages of electric drives is that through use of servomotors, solenoids, and feedback, very accurate control of both speed and position is possible. In addition, electrical robots generally require less floor space. The disadvantages of electric robots are that they have slower response times and lower load capacities. Additionally, in the presence of volatile gases, such as would be found in a paint booth, electrical robots may provide explosion or fire hazards. The disadvantages are far outweighed by the advantages and electric drive units are beginning to capture a larger share of the total market. In addition, most of the weaknesses can be overcome by system design. That is, the spark hazard can be negated by sealing the brushes to preclude contact with the

volatile gases and through the use of torque amplifiers or larger horsepower motors larger loades (sic) are possible.

> Hydraulically driven robots provide high speed, high load capacities and are mechanically simple to design, fabricate and maintain. These robots require a hydraulic power unit which occupies additional floor space. The most undesirable feature of hydraulically driven robots is that there is always the danger that a seal may rupture and cause a hydraulic fluid spill. This may contaminate products, damage capital equipment, create a safety hazard or, at a minimum, result in a housekeeping problem. Also, hydraulics have difficulty in achieving precision control of speed and position. For these reasons, hydraulic robots are becoming less attractive in the marketplace and losing shares to electric robots.

The defendants' report says:

> Drive systems can be pneumatic, electrical or hydraulic. Pneumatic systems are most commonly used in lower cost robot systems and account for about 30 percent of the total. Pneumatic drives offer low initial cost, high reliability and low maintenance costs although poor speed and position controls make this drive system adequate for only limited sequence operations. Electrical drive systems also account for about 30 percent of the total and are gaining in importance. These systems require less floor space and allow very accurate control of speed and position although slower response times and and lower load capabilities are typical. Hydraulic systems provide high speed, high load capabilities and are relatively easier to design, fabricate and maintain. Their most undesirable feature is the risk of a seal rupture which presents a safety hazard and the potential for a long downtime. Difficulty in achieving precise control of speed and position are other disadvantages which are causing the one dominant hydraulic drive system to lose

*share to other drive systems, especially electric.*

*Hydraulic systems provide high speed, high load capabilities and are relatively easier to design, fabricate and maintain. Their most undesirable feature is the risk of a seal rupture which presents a safety hazard and the potential for a long downtime. difficulty (sic) in achieving precise control of speed and position are other disadvantages which are causing the one dominant hydraulic drive system to lose share to other drive system, especially electric.*

The obviousness of defendants' wholesale taking of plaintiff's original expression is plain on the face of the texts. The fragmentary resettling of various elements of the plaintiff's expression in the body of the defendants' passage cannot conceal the crude appropriation.

In discussing environmental and personal safety in the robotics field (PX. 19, p. 5), plaintiff's report says:

Environmental and personnel safety does place requirements on both the producers and users of robots to ensure that societal goals are not compromised to improve a manufacturer's cost structure. But these are common precautions that are experienced with the installation of any capital equipment and require little additional attention because the equipment is a robot. In fact, *safety regulations are a positive demand factor for robots. In many industries, workers are exposed to hazardous gasses, liquids, noises, shocks, vibrations, temperatures, dusts, and undesirable as well as unhealthy conditions. Historically, jobs in these harsh environments were sources of personnel injuries that resulted in high insurance costs, high absenteeism, high turnover and shortages of personnel.* These economic factors are quantifiable and are in addition to the industry's moral and societal obligations which are more difficult to quantify. As a result, either voluntarily or mandated, these industries invested in safety equipment, shorter hours, medical services, and other means to protect workers. These cost items are not required when the worker is mechanical rather than human. *Therefore, the strict enforcement of regulations of the Environmental Protection Agency (EPA) and the Occupational Safety and Health Administration (OSHA) would result in an increase of the incentive to robotize operations in hazardous environments.* Also, as the number of available trained blue collar workers declines due to retirement of existing workers and a lack of a sufficient replacemtn (sic) pool, *it will become increasingly difficult to find workers willing to work in hazardous environments,* even with protective clothing and services.

The defendants' report says:

*Regulatory Considerations*

In many respects, environmental and personal *safety regulations will promote the adoption of robotic technology. In many industries, production workers are exposed to hazardous fumes and liquids, dust, high temperatures, shock, vibration, noise and other undesirable as well as unhealthy conditions. Jobs in these harsh environments have traditionally been sources of personnel injuries (that have resulted in high insurance costs), high absenteeism and high turnover of personnel.* Further, as the labor market situation tightens in the 1990's *it will be increasingly difficult to find workers willing to work in hazardous environments. Strict enforcement of the Environmental Protection Agency (EPA) and the Occupational Safety and Health Administration (OSHA) will thus tend to increase the incentive to robotize these hazardous operations.*

Taken in combination, these sentences appropriated from the plaintiff constitute an original expression on environmental and personal safety factors shaping a response from the robotics industry to changing attitudes about such industrial hazards.

About robots in general and their categories (PX. 19, p. 6), the plaintiff's report says:

*General*

By design, *robots are general purpose devices capable of being employed in various tasks. However, because tasks tend to differ in terms of complexity, load capacities, precision and other such variables,* robots tend to specialize into a few groups of tasks. *Although many robot models are applicable to many and in some cases all applications, the specific requirements of the individual task or group of tasks tend to favor robots* of one or another *specific design.* In general, *robotic applications tend to fall into one of four broad categories: 1) coating* (or spraying); *2) welding; 3) material handling; and 4) processing.*

The defendants' report says:

*General*

*Robots are general purpose devices capable of being employed in various tasks that differ in terms of complexity, precision, load capabilities and other variables. Although many robot models can be used in numerous applications, the specific requirements of the individual task or group to tasks tends to favor robots of a specific design. Robotic applications tend to fall in one of four broad end-use categories: 1) coating; 2) welding; 3) material handling; and 4) processing.*

There is here again an example of virtual verbatim copying. The ideas expressed by the plaintiff are factual in nature, though not pure fact, since subjective assessment is at least implied in them. In any case, the assertion by the author of plaintiff's report that the four categories of robots herein defined are original with him was not effectively challenged at trial. Accordingly, plaintiff's full passage constitutes original expression and as such is legally protectable.

On the market potential for arc welding robots (PX 19, p. 11), plaintiff's report says:

The process discussed above is the most common job given to arc welding robots. But a robot sufficiently articulated and controlled to perform arc welding is also capable of perfomming several other re-lated jobs. These jobs include gas welding, flame cutting, laser welding and cutting, plasma-arc welding and water jet cutting. In most cases these operations deal with metallic materials. *As a greater number of products incorporate nonmetallic materials such as plastics, ceramics and composites,* the traditional thermal processes for welding and cutting will not work and may even destroy the material. Therefore, it can be assumed that *more arc welding robots will be asked to wield lasers and water jet cutters in the future.*

The defendants' report says:

When compared with spot welding, arc welding has more applications (mostly in the fabricated metal products industries) that are suitable for robots. As a result, arc welding robots will gain the lion's share of the welding market with sales increasing 22 percent per year to $450 million in 1995. *Because a greater number of products are incorporating nonmetallic materials such as plastics,* other polymers, *ceramics and composites, arc welding robots equipped lasers or water jet cutters will provide opportunities.*

The focus here is upon the last two sentences of plaintiff's passage, and the last sentence of defendants' passage. The latter is plainly a virtually verbatim copying of the former, with the second element of plaintiff's first sentence omitted. The expression of plaintiff's forecast in terms of laser and water jet cutter innovations is original, and protectable. It was established at the trial that defendants' paraphrase contains a structural error, the word "with" having been omitted before the word "lasers". As published, defendants concede that the sentence makes no sense.

In considering palletizing robots (PX. 19, p. 12), plaintiff's report says:

*Palletizing robots are similar to pick-and-place robots with the exception that one of the locations, either source or the destination, involved in the transfer is a pallet or palletized container* which has become ubiquitous in

the manufacturing environment. Palletized oads (sic) are also common in non-manufacturing industries. Raw materials are commonly received in palletized loads and finished products are commonly palletized to facilitate storage, warehousing and shipments.

The difference between a palletizing robot and a pick-and-place robot is that *a palletizing robot needs to adapt to more situations.* A pick-and-place robot has a simple, repeatable motion to perform. A palletizing robot must alter its motion to place the product at a different location on the pallet, *a different height for each tier in the stack, a different compartment of a box or crate or different quantities placed on different pallets.* This means a palletizing robot in general must be capable of performing all the jobs of a pick-and-place robot, but must have *some amount of adaptable control (usually an electronic controller).* Also, because the payload is not transferred the exact distance each time, *the arm must have a higher degree of articulation and adaptability. As a consequence, palletizing robots tend to be more expensive.*

The defendants' report says:

*Palletizing Robots—This robotic type is similar to parts transfer robots with the exception that either the source or destination location is a pallet or palletized container.* Because *the palletizing robot needs to adapt to a greater variety of situations* (arising from varied product location on a pallet, *differing heights for each tier of the stack, variances in quantities between pallets, individual compartments in a box or crate,* etc.), *a higher degree of articulation and adaptability in the arm and some amount of adaptable control (usually an electronic controller) is required. This results in higher cost.*

The passages express three common ideas. Plaintiff's passage is highly original in expression, and the substantial similarity of defendant's statement to it is undeniable.

On processing robots (PX. 19, p. 13), the plaintiff's report says:

*Processing Robots*

*Processing robots are those that actually perform the operation which adds value to the material in the manufacturing process. This differs from material handling robots which primarily assist humans and other machines.* Broadly defined, both coating robots and welding robots represent types of processing robots because they perform the painting and welding operations. However, these two types of processing robots have unique requirements which distinguishes them from other processing types and represent significantly large market segments by themselves. For those reasons, they are broken out separately in this study.

*Processing robots are divided into three categories—parts finishing, assembly and inspection.* These categories provide the largest market opportunities for robots but perhaps the most resistance. The market segments described about all have some undesirable feature that make robots a welcome alternative. There are problems with noxious fumes and temperatures, noises, dirt, and weights beyond acceptable levels for humans. Processing robots usually do not work in such environments and may be competing with humans and other forms of automation for what has become a prize possession—a job. Although in the long run there is enough work for everyone (in fact, robotics will create additional work), the short term may entail some amount of displacement and retraining. These prospects frighten many members of organized labor, but perhaps they frighten front-line supervisors and middle managers even more. When fewer blue collar workers are employed, fewer supervisors are required and they probably do not enjoy the protections of a collective bargaining agreement. Middle mangers dread the prospect of having to return to school to understand how to use robots when they have already become adept at utilizing human workers or other machines. The success or failure of a processing robot installation may hinge more on the acceptance by

lower level management than on negotiations with bargaining units.

The defendant's report says:

*Processing Robots*

*These robot types actually perform the operation which adds value to the* intermediate *materials* or parts/components used *in the manufacturing process as opposed to material handling robots which assist the worker or other machines.* Accounting for $81 million in sales, *processing robots* perform a multitude of tasks but *can be generally classified into* one of *three categories— parts finishing, assembly and inspection.*

As is obvious from the comparison, plaintiff's passage is more complete, more detailed, and incontestably more original. The defendants' have been content to "borrow" only two definitional elements of the robot under review. However, at trial the author of plaintiff's study insisted that the term, functional definition and sub-categories of this type of robot were original with him. As he was a highly credible witness, and no convincing evidence was introduced by the defendants to contradict him, the Court finds that his expression on the aspects cited of processing robots was original and legally protectable.

With respect to parts finishing robots (PX. 19, p. 14), plaintiff's report says:

*Parts finishing robots were first used in foundries* two decades ago *to trim the flash off of castings removed from die cast molds.* Since that time, *parts finishing robots have been* equipped with end effectors which can be called "hand tools." End effectors that are pneumatically operated *drills, sanders, grinders, polishers,* routers and others have already been developed and undoubtedly will be joined by a large number of new tools in the future. To date, most operations performed by *parts finishing robots have augmented the functions of machine tools.* However, *the sophistication of robotic controls has enabled them to take on the jobs previously performed by small milling and boring machines* at considerably lower

costs. There are other machining functions that can be adopted by robots and are currently under investigation. This development pits robots not only against human workers with hand tools but also against other forms of automation. The market will dictate the most efficient use of humans, robots and fixed automation.

The defendants' report says:

*Parts Finishing Robots—Originally employed to trim the flashings off of castings removed from die cast molds* in foundry operations, *parts finishing robots are* being increasingly used in other applications such as *augmenting the functions of machine tools.* Advancements in the *sophistication of robotic controls has enabled these robots to perform tasks previously performed by milling and boring machines.* Other machining operations (*grinding, drilling,* deburring, *polishing, sanding,* etc.) also offer opportunity for parts finishing robots which had $18 million in sales in 1984. Parts finishing robots are also being developed that have the ability to change their own tooling, enabling one robot to perform several finishing operations.

It is apparent that unique expressions of three ideas by plaintiff have been taken by the defendant to form the first two elements of its three element statement. These relate to the initial historical use of these robots, present principle operational function, and an incipient new departure in supplanting small machine tools.

Passages describing inspection robots appear in both reports (PX. 19, p. 15). Plaintiff's report says:

*In most inspection applications, sensory capabilities are required because the robot must "sense" the acceptability of the products.* It has only been recently that these sensors have been made commercially available. As with other new technologies, the resultant costs have been high. But as in other new technologies, the learning curve is steep and costs drop quickly. Also, new methods that do not require the use of very expensive techniques are being found. For

example, the most commonly considered sensory system is vision. However, in many inspection applications crude tactile systems are all that is required. These systems may in some cases entail only a combination of limit switches. As users and producers gain experience in inspection applications, more inexpensive means will be developed. However, this does not mean a decline in average unit price. Although the sensing techniques may become less expensive, inspection robots will still need sophisticated data processing capability to assess the acceptability of the product. Also, it is highly likely that inspection systems will require communications capability to be properly utilized. These factors are expected to raise the software contents of the total price.

The defendants' report says:

> *Inspection Robots*—These robots are used to inspect finishing parts and components. *Due to the nature of inspection applications, sophisticated sensory capabilities are required because the robot must sense the acceptability of the product.* Prior to the 1980s, the unavailability of the requisite sensory capabilities and high development costs precluded their commercialization but they have recently emerged as a robotic technology. These robotic systems are the most expensive, with systems costing in excess of $300,000 common.

The plaintiff's original description of this class of robot, not stated or implied in its title, is embodied in the core phrase "the robot must 'sense' the acceptability of the products." This seminal and highly idiosyncratic expression, from which all else in both passages flows, has been copied virtually verbatim by the defendants. The Court concludes that the failure of the defendants to place the word "sense" in quotes is evidence of an intent to conceal direct copying, since the common usage of the word in such a context requires quotation marks.

On manufacturing requirements (PX. 19, p. 15), plaintiff's report says:

> *Manufacturing*
> *Manufacturing requirements do not represent a significant barrier to entry to the robotics industry. The majority of the manufacturing processes entail light assembling and metal fabrication.* The operations tend to be similar to those found in many durable goods industries. *Depending on production lots, the assembly can most efficiently be performed manually, or with automation and can be subcontracted to efficient assembly shops.* It is likely that the robotics industry will itself become a large user or robots.

The defendants' report says:

> *Manufacturing*
> *Manufacturing requirements do not represent a deterrent to entry as the majority of the manufacturing processes entail light metalworking and assembly* of a batch-oriented nature. *Depending on the production lot, the assembly* of the respective bar and sheet metal, castings, machined parts, electrical components, completed controls and other finished goods *can often be performed manually, with automation, or even subcontracted out to a more efficient shop for assembly.* As a result, capital requirements have not been great. A 50,000 square foot facility for manufacturing and offices is sufficient and if it is leased, fixed capital requirements can be held to less than $5 million. A significant amount of spending occurred in the early 1980s as companies entered the industry and invested in capital equipment and facilities for the production and marketing or robots. Spending peaked and declined to $30 million in 1984, or for 7 percent of industry sales. About 75 percent of this was for machinery and equipment, over 20 percent was directed toward buildings and leasehold improvements, and the remaining small amount for land acquisition and site development.

Although this is a somewhat closer question, it is nonetheless clear that a too close paraphrase has been made by the defendants of the plaintiff's original expression relating to ease of penetration of the robotics industry by would-be competitors, as

far as manufacturing requirements are concerned. The plaintiff's articulated insight into this problem is an original expression, principally in its observation about subcontracting to efficient assembly shops.

A further observation on manufacturing (PX. 19, p. 16) appears in plaintiff's report:

*In manufacturing of this type, the higher the degree of automation the lower is the degree of cost flexibility.* During economic downturns, the highly automated producer may experience more hardships than those utilizing manual or robotic processes. *Only a few producers, namely GMF, Westinghouse,* Prab, *Cincinnati Milacron, produce sufficient quantities to justify fixed automation. Nevertheless, for competitors whose entry represents either vertical or horizontal integration, fixed automation may be shared by other related products and result in lower operating costs which can create various market advantages.*

The defendants' report says:

As the robotic industry matures and as foreign competition intensifies, the need for greater automation in the industry will mount. Indeed, the industry itself will become a large user of robotics. *Only a few competitors, such as Cincinnati Milacron, GMF Robotics, and Westinghouse have gained enough market share and business experience to justify fixed automation. Nevertheless, for competitors whose entry represents either vertical or horizontal integration, fixed automation may be shared with other related products and result in lower manufacturing costs. This could create a market advantage* in that a cost leadership position would be attained. However, *in manufacturing of this type, the higher degree of automation will result in a lessening of flexibility.*

After an entirely innocuous and prosaic expression in his first sentence, defendants' author closely paraphrases the first and third sentence of plaintiff's report. Plaintiff's last sentence, is especially rich with original expression which communicates the core idea and the most sophisticated insight of the passage. Plaintiff's passage on the whole, an integrated expression, has been illicitly copied.

About long term forecast (PX. 19, p. 16), plaintiff's report says:

*In the near term, manufacturing requirements will tend to remain relatively flexible as producers choose the degree of automation optimal for their production runs. In the long term, as production rates increase, the highly automated producers should achieve some economies of scale. At that time, manufacturing requirements will be a more formidable barrier to market entry.*

The defendants' report says:

*In the near-term, manufacturing requirements will continue to be relatively flexible with automation tending to be optimized relative to production runs.* During periodic softenings of the economy, the highly automated producers may experience greater hardship (because of a low degree of activity utilized fixed investment) than those producers utilizing a greater degree of manual or flexible manufacturing processes. However, *in the long-term, as business experience is gained and as production runs lengthen, the more highly automated producers will achieve economies of scale* and positions of cost leadership. *At that time, manufacturing requirements* will have increased to a point to where they *will be a formidable barrier to entry.*

The first, third and fourth sentences of defendants' passage have been plainly taken, in substance, from plaintiff's passage. The defendants' second sentence, though apparently original, cannot, however, save the entire passage from a finding of illicit copying of original expression.

### D) *Copyright Elements*

■ It is undisputed that Business Trends Analysts has a valid copyright in its 1984 Robotics Industry Study. To establish that defendants have infringed this work, plaintiff must establish that defend-

ants "copied" its work and "improperly appropriated" its "expression." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.1980). Typically, wrongful appropriation is shown by proving a "substantial similarity" of copyrightable expression. *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). However, factual information is in the public domain, and even if copied, cannot be protected by copyright. See *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 309 (2d Cir.1966) cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1964); *Oxford Book Co. v. College Entrance Book Co.*, 98 F.2d 688 (2d Cir.1938). This is not to say, however, that factual concepts or ideas, if expressed in an original way, cannot be copyrighted. It is axiomatic that the expression of any idea, as long as the mode of expression is sufficiently original, can be legally protected under copyright law. See *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir.1936), cert. denied, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). Although the case law in this circuit makes clear that historical information, factual data and research results are not generally within the compass of copyright, district courts are advised that in distinguishing between such elements on the one hand, and copyrightable expression on the other, "courts may lose sight of the forest for the trees. By factoring out similarities based upon non-copyrightable elements, a court runs the risk of overlooking wholesale usurpation of a prior author's expression," *Hoehling, supra*, 618 F.2d at 980.

In this case, the Court finds especially persuasive *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir.1977), cert. denied, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). There, the Court dealt with the troublesome line between untrammelled latitude to republish facts in accounts of news events, generally, and restriction on appropriation of the stylistic and structural construct through which such facts are expressed. There, defendant newspaper published almost verbatim, abstracts from plaintiff's copyright-

ed research reports. Citing *International News Service v. Associated Press*, 248 U.S. 215, 234, 39 S.Ct. 68, 70, 63 L.Ed. 211 (1918), our Circuit observed that in "considering the copyright protections due a report of ... factual developments, it is important to differentiate between the substance of the information contained in the report ... and 'the particular form or collocation of words in which the writer has communicated it' ... What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments." *Wainwright, Securities, Inc.*, 558 F.2d at 95, 96. Defendants' position in the case at hand is much less compelling than that of the Defendant in *Wainwright Securities, supra*. There, the fair use doctrine was invoked by a newspaper sold to the public at large. Here, the defendants have declined to invoke the doctrine, and their assertedly infringing vehicle is not a general circulation periodical, newspaper or broadcast. In short, journalistic protections and freedom of the press are not at issue here. We are dealing instead, as was the Court in *Wainwright*, with a self-serving use of plaintiff's report with the intent "of fulfilling the demand for the original work," 558 F.2d, at 96.

The fundamental twofold task before the Court is to determine, since defendants' concede access to plaintiff's work, first, whether substantial similarities exist, to establish copying, and second, whether, if established, the copying amounts to illicit copying (unlawful appropriation). *Arnstein v. Porter*, 154 F.2d 464 (2d Cir.1946).

The Court takes particular note of certain artificial dissimilarities (from plaintiff's text) throughout defendants' text. Our Circuit has held that arbitrary word inversions and substitutions can amount to "a crude effort to give the appearance of dissimilarity" and can itself be evidence of copying. *Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144 (2d Cir.1956).

The record herein establishes, and the Court finds as a fact, that there are sub-

stantial similarities between the two works in question. This is established upon the broad textual comparison of the full works and the accused passages. Accordingly, this Court further finds that upon conceded access and substantial similarities between the two works, that the fact of copying by the defendants has been established. This finding is further augmented by what plaintiff's counsel referred to as the "smoking gun," Tr. 864, defendants' marked up photocopy of plaintiff's report, and upon the wholly unconvincing denials of Mr. Swift that he copied Mr. Digeronimo's expression, which are rejected. And of course, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir.1936). The final factual question then becomes whether the established copying amounts to illicit copying.

■ A certificate of copyright establishes a presumption of originality in the work registered. Furthermore, the Court notes that the defendants' submitted no documentary evidence that Mr. Digeronimo had taken any of his expression from the preexisting works of others, or that expression common to both plaintiff's and defendants' works derived from separate, common sources, though there was some general and amorphous reference to such possibilities in the examination of various witnesses. Absent the Court's attention being drawn to any concrete texts, it was inconclusive and unconvincing.

On the basis of this record, I find as a fact, that the plaintiff's work contains substantial originality. *L. Batlin and Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir.), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). Furthermore, I find, upon a comparison of the texts of the rival studies, that the original form of expression copied by the defendants from the text of the plaintiff's report constitutes illicit copying. Accordingly, improper appropriation by defendants has been established as a fact. Finally, the Court concludes that an ordinary lay observer would recognize that defendants appropriated plaintiff's

copyrighted work. *American Greetings Corp. v. Easter Unlimited, Inc.*, 579 F.Supp. 607, 614 (S.D.N.Y 1983).

Is the volume of illicit copying sufficient to establish an infringement? The standard in this regard remains that suggested by Mr. Justice Story almost one hundred fifty years ago:

"If so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially to an injurious extent appropriated by another, that is sufficient in point of law to constitute a piracy *pro tanto.*"

*Folsom v. Marsh*, 9 Fed Cas. 348, No. 4901 (C.C. Mass. 1841). The Court concludes, on the basis of its comparison of the rival works, that this issue of ultimate fact must be resolved against the defendants. There is here literal similarity, through verbatim copying, or such close paraphrasing as to constitute virtual verbatim copying, of passages amounting to many hundreds of words. Accordingly, the Court concludes that the plaintiff has established infringement of its copyrighted robotics study by the defendants.

### E) *Damages*

■ BTA's robotics study was published (by Predicasts) in December, 1984; it obtained its exclusive rights to the study through its licensing agreement with Predicasts in January, 1985; and it registered the copyright on the study in November, 1985. TFG published its robotics study before plaintiff's copyright was registered, in September or October, 1985. Accordingly, statutory damages and attorney fees, authorized under 17 U.S.C. § 504(c), are not available to the plaintiff because the copyright in question was not registered within three months of the publication date of the work claimed to be infringed. See 17 U.S.C. § 412(2). See, also, *Hays v. Sony Corp. of America*, 847 F.2d 412, 415 (7th Cir.1988); *Singh v. Famous Overseas, Inc.*, 680 F.Supp. 533 (E.D.N.Y.1988).

Therefore, any damages sought by plaintiff for the infringement must be established under § 17 U.S.C. 504(a), which authorizes actual damages in lost sales revenues or other competitive injury, and pay-

ment of any profits obtained by the defendants through the infringement.

■ It is undisputed that TFG sold 37 copies of its infringing study at a special rate of $150.00 per copy, which amounted to a 90% reduction from the per copy price of the rival study being offered by BTA. Tr. 402. This represents gross cash revenues realized by defendants on the sale of the infringing study of $5,550. "Once a copyright owner has shown evidence of an infringer's gross revenues, § 504(b) places upon the infringer the burden of proving his deductible expenses." *Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 470 (2d Cir.1985). The defendants failed to carry their burden in this connection, placing no documentary evidence or systematic analysis in the record, relying instead upon generalized assertions that no profit was made because that portion of the regular salaries of Mr. Swift and Ms. Fetsko–Louie attributable to their work on the infringing study exceeded gross revenues. The Court rejects this testimony as insufficiently concrete. The Court further concludes that defendants' gross revenues on the sale of the infringing 37 copies, beyond its gross cash revenues, included revenues quantifiable as good will and market advantage. Tr. 417–420. This amount represents the difference between the prevailing market price of the study, $1500.00, and the actual sales price of $150.00. This represents additional profit of $49,950. Accordingly, the plaintiff is entitled to a damage award equivalent to the gross profits obtained by defendants through their infringement, comprising gross cash profits of $5550.00 and gross good will profit and market advantage quantifiable at $49,950.00, for a total of $55,500.00.

■ On the question of actual damages suffered by the plaintiff in his business as

a result of defendants' infringement, "the primary measure of recovery is the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement." *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc., et al,* 807 F.2d 1110, 1118 (2d Cir.1986).

Mr. William Rosenthal was the plaintiff's principal witness testifying on projected lost sales and revenues for the Predicasts Robotics study as a result of defendants' infringement. Mr. Rosenthal opined that BTA should have sold between 70 and 140 copies of the Predicasts Robotics Study. This opinion was predicated upon the assumption that BTA could expect to receive two, three or four orders per every 1,000 pieces of direct mail sent out. Tr. 287. Based upon BTA's total mailing of 35,000 mail pieces relating to the robotics study, Mr. Rosenthal predicted that BTA would sell between 70 to 140 copies of that study. Tr. 287–88. Mr. Rosenthal, however, could offer no concrete basis for his assumptions about response rates beyond his generalized "experience." Tr. 325.[1] Significantly, he disavowed any knowledge of the actual response rates experienced by BTA, TFG or other industry study producers, Tr. 323–25, and BTA offered no proof regarding its own historical response rates. Nor could he explain why BTA should have expected sales of the Robotics study far in excess of the Predicasts' sales of its best performing titles. Tr. 332. Mr. Rosenthal further conceded that the sales performance and, hence, direct mail response rates, of BTA for the Robotics study during the period prior to any alleged wrongful conduct by TFG was far below what he would have projected. Tr. 33.[2] Mr. Rosenthal was shown a graphic depiction of BTA's sales of the Robotics study (DX EEE) and asked to assume, as later conceded by another

1. Rosenthal admitted that his assumptions regarding response rates were made without objective support, testifying that:
 If I had no history in the industry, straight out of college and kind of green, then I would call it a straight guess. I would like to say that there is some judgment applied *to my guess* and that the figures I have given are informed, and informed opinion."

(Tr. 325) (Emphasis added).

2. Rosenthal stated that competition within a specific title or subject was a determinant of sales performance. Tr. 324. Rosenthal was unaware of the level of competition in the field of industry studies addressing Robotics, however, Tr. 325.

BTA witness (*see* Tr. 511), that there could have been no impact from TFG until September 1985 or later. On that basis he concluded that BTA's response rates for the Robotics study were well below even two responses per 1,000. (Tr. 338–39). In fact, various extrapolations from that "clean period" demonstrate a simple and compelling fact, that BTA's actual sales were at least as good if not better than what should have been expected based on a fair reading of historical experience. Tr. 340–41. Finally, Mr. Rosenthal made no effort to assess the level of competition in Robotics studies during the period in question, despite his admission that such competition could have a substantial impact upon sales. Tr. 302.

BTA's marketing manager, Michael Guidice, attempted to project sales of its Robotics study on the basis of Predicasts' historical sales of a prior edition of that title, "E70–Robotics." That earlier edition sold seventy-one copies and Mr. Guidice claimed that BTA expected to sell at least that many of the successor study. Tr. 474–75. This analysis was generally flawed because of differences in promotional expenditures and other factors, and was simply unconvincing.

Accordingly, plaintiff has failed to establish actual damages as a consequence of defendants' infringement of BTA's robotics study.

## III. THE TRADEMARK CLAIM

BTA's claim under the Lanham Act relates to the asserted use of the Predicasts trademark by TFG. The minimal evidence at trial relating to the trademark claims established that the limited uses TFG made of the term "Predicasts" were both accurate and permissible; that there was no confusion on the part of the actual or potential customers for industry studies; and that BTA suffered no injury as a result of any use of the Predicasts name by TFG.

The core of BTA's complaint is that certain statements in TFG's promotional and sales literature constitute misuse of the "Predicasts" trade name in a manner that is likely to cause consumer confusion. The allegedly misleading statements are as follows:

(i) TFG is headed by William M. Weiss, a co-founder of Predicasts Inc. with over thirty years of business research and planning experience in industry and government.

(ii) The research group is headed by Thomas Kevin Swift, formerly Research Director of Predicasts.

(iii) TFG studies draw on proprietary data bases developed by Robert Baumgartner, architect of the Predicasts Information System.

*See* Px. 14.

The accuracy and propriety of these statements is not in dispute.[3] As Judge Weinfeld found in his opinion denying plaintiff's application for preliminary injunction in this case, "[i]t is undisputed that those statements are factually accurate, and the experience of TFG's principals is information that TFG may properly present to the public."[4] BTA presented no evidence at trial suggesting that this material was in any way inaccurate. Indeed, BTA's president, Mr. Dennis Macchio, admitted that the statements were accurate. (Tr. 986).

It has long been settled that the trademark laws do not prohibit the use of a company name or trademark in a non-trademark sense where the trademark is used fairly and accurately as a means of identifying either an individual working for a company or of describing the nature of goods or services being offered by that company. *See, e.g., Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924).[5] Such is the case here, where

---

3. The TFG logo bears no resemblance to the Predicasts log. (*Compare* PX 1 and PX 5).

4. *Business Trends Analysts, Inc. v. The Freedonia Group, Inc.*, 650 F.Supp. at 1461.

5. Significantly, Section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4), expressly provides a "fair use" defense applicable to registered marks which have become "incontestable" under the Act. The Second Circuit has held that the fair use defense applies where "the term charged to

the references to Predicasts in the description of the prior work experience of Messrs. Weiss, Swift and Baumgartner are accurate and presented without undue emphasis. Accordingly, even assuming for purposes of argument that Predicasts is a valid common law trademark in which BTA acquired certain rights under the Agency Agreement, TFG's reference to Predicasts in its literature was entirely proper as a matter of law and provides no support for a claim under Section 43(a) of the Lanham Act.

Furthermore, no evidence exists to suggest that TFG's promotional materials or other conduct has misled, confused or deceived consumers about the nature or quality of TFG's products or services, or is likely to do so in the future. As BTA presented no such convincing evidence, its claim under Section 43(a) must fail as a matter of law.

As the Second Circuit has stated, "Section 43(a) is meant to protect the public from confusion regarding the source of the goods produced." *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 215 (2d Cir. 1985). For that reason, it has long been settled that Section 43(a) requires a showing by the plaintiff that the defendant's conduct is likely to mislead, confuse or deceive a substantial number of consumers. *See Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed. 2d 75 (1979); *Riverhead Paints v. PPG Industries,* 2 U.S.P.Q.2d 2035 (E.D.N.Y. 1987) [1987 WL 16877]; *Grenadier Corp. v. Grenadier Realty Corp.,* 568 F.Supp. 502 (S.D.N.Y.1983). Here, there is no conceivable basis in the evidence from which the likelihood of consumer confusion could be inferred.

Even the letter which BTA has cited as TFG's most egregious "misuse" of the Predicasts' name, the so-called "We're Back" letter sent out by TFG in August 1985, does not support its claim. (PX 11). Contrary to BTA's contention, the plain import of this letter is that certain individuals who once worked for Predicasts have returned to the industry studies business, and not that Predicasts itself has done so. The testimony of the letter's author, Mr. Weiss, was entirely consistent with this reading of the letter. Tr. 395. Furthermore, BTA was unable to present evidence of any customer who was confused by this letter, or indeed any other action on TFG's part. Nor has plaintiff demonstrated any additional "misuses" of the Predicasts name. As Judge Weinfeld has noted in an unrelated case, "The absence of testimony from such customers invites an adverse inference." *Information Clearing House v. Find Magazine,* 492 F.Supp. 147, 160 (S.D.N.Y.1980). *See also Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220, 1231 & n. 44 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Accordingly, this claim must fail.

## IV. THE UNFAIR COMPETITION CLAIM

■ The core of this complaint by BTA is the asserted misappropriation by TFG of a number of Predicasts Industry Studies that were the subject of BTA's licensing agreement with Predicasts. In substance, BTA claims that TFG is palming off its industry studies as being in some fashion derived from or based upon Predicasts studies in which BTA has an exclusive license.

To succeed on such a claim under New York law, a plaintiff must demonstrate that a " 'substantial number of ordinarily prudent purchasers are likely to be mislead or confused as to the source of the different products.' " *Grenadier Corp. v. Gre-*

---

be an infringement is not used as a trademark 'and is used fairly and in good faith only to describe to users the goods and services of such party, or their geographic origin.' " *Abercrombie and Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 12 (2d Cir.1976) (defendant's use of the term "Safari" in connection with sale of boots held to be fair use of plaintiff's registered trademark SAFARI). While the "Predicasts" mark is neither registered nor incontestable, the spirit of the "fair use" exception as described in *Abercrombie and Fitch Co.* applies with at least equal force and further supports the propriety of TFG's promotional literature.

*nadier Realty Corp., supra* at 503 (S.D.N.Y.1983) (quoting *Information Clearing House, Inc. v. Find Magazine, Inc., supra* at 154); *See also Mushroom Makers, Inc. v. R.G. Barry Corp., supra. See generally, Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 543, 369 N.E.2d 1162, 1165, 399 N.Y.S.2d 628, 631 (1977). BTA made no showing on the trial record of consumer confusion and, accordingly, its claim must fail.

■ An alternative theory of plaintiff's unfair competition claim, that TFG engaged in unfair competition by misappropriating the titles, contents and format of Predicasts studies published on the same topics, is preempted under the copyright law. Therefore, this claim must also fail.

Section 301(a) of the Copyright Act of 1976 ("the Copyright Act") states as follows:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (1982).

■ Under section 301(a), a state claim is preempted if two conditions are satisfied: (1) the subject matter of the work in which the state law rights are asserted comes within the subject matter of the copyright law; and (2) the state law right asserted in the work is equivalent to the exclusive rights provided by the Copyright Act. *See Harper & Row Publishers, Inc. v. Nation*

*Enterprises*, 723 F.2d 195, 200; *Universal City Studios, Inc. v. T–Shirt Gallery, Ltd.*, 634 F.Supp. 1468, 1474–75 (S.D.N.Y. 1986).

Here, the Predicasts studies in which BTA seeks to assert rights under state unfair competition law clearly fall within the subject matter of the federal copyright law.[6] Thus, the only remaining question is whether the rights that BTA asserts in its unfair competition claim, the right to the exclusive use of the titles, contents and format of those studies, would be "infringed by the mere act(s) of reproduction, performance, distribution or display." *Universal City Studios v. T–Shirt Gallery Ltd., supra* at 1475, *citing Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F.Supp. 1523, 1535 (S.D.N.Y.1985). Of this fact there can be no dispute.

It is the settled law of this Circuit that state law claims seeking to vindicate legal or equitable rights equivalent to any of the exclusive rights granted to a copyright owner under the Copyright Act are preempted unless the plaintiff can establish that its claim is predicated upon either "quantitatively different conduct on the part of the infringing party" or that there exists a "fundamental nonequivalence between the state and federal right implicated." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 201 (2d Cir.1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (*"Harper & Row"*). *Accord Ehat v. Tanner*, 780 F.2d 876 (10th Cir.1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 86, 93 L.Ed.2d 39 (1986); *Kamakazi Music Corp. v. Robbins Music Corp.*, 522 F.Supp. 125, 137 (S.D.N.Y.1981), *aff'd*, 684 F.2d 228 (2d Cir. 1982). *See generally* 1 M. Nimmer, *Nimmer on Copyright* § 1.01[B] at 1–9 (1986). Here, plaintiff can do neither. Any claim involving the misappropriation or reproduction of the title, content or format of any Predicasts study does not rest on conduct

---

6. Plaintiff's copyright claim is limited to the TFG Robotics Study. BTA lacks standing to pursue a copyright claim on any other reports. Under the copyright law, a plaintiff must plead and prove that it owns or controls a valid and registered copyright in the work alleged to have been copied in order to recover for alleged infringement. *See Hoehling v. Universal City Studios, Inc., supra.* Here, BTA has never made any such allegation, and the record contains nothing to suggest that any basis exists upon which BTA could do so.

qualitatively different from a copyright claim, and to the extent that the New York law of unfair competition would protect against such conduct, such a right is virtually identical to that granted under the copyright law.

## V. THE TRADE SECRET CLAIM

 BTA's trade secret claim is predicated upon TFG's possession of a customer list for a single and discrete Predicasts product line known as "composite forecasts." In order to prevail on its claim regarding this purported trade secret, BTA would have had to demonstrate that it had a cognizable interest in the material in the possession of TFG, that TFG had not received the material with permission from Predicasts, and that the list was truly maintained as a "secret" by Predicasts. The proof offered by BTA at trial was deficient in all respects.

TFG admitted that it received a list from Predicasts reflecting customers of the composite forecast service, a service and product line unrelated to industry studies, and a service which had been abandoned by Predicasts. Tr. 380, 586, 881–82. BTA had failed to establish that it had any right or interest in this list. BTA had no rights in the composite forecast product and it did not receive the list at issue pursuant to the Agency Agreement. PX. 3, ¶ 2.2 Tr. 33.

Furthermore, even if BTA did have some interest in the forecast product customer list, Predicasts' actions would serve to defeat any such claim. This list was given to Mr. Swift by competent Predicasts executives. Tr. 380, 586. Mr. Swift's recital of the circumstances surrounding his possession of the list is uncontradicted.

Finally, the trial record is clear that Predicasts failed to take those steps necessary to maintain its customer lists as trade secrets. *See Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1063 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *Restatement of Torts* § 757, comment b (1939); *Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 993, 485 N.Y.S.2d 143, 144–45 (3d Dep't 1985). BTA's principal witness on this point was Mr. Neal Burk, who claimed that Predicasts' customer lists were maintained in a confidential fashion. Tr. 25. He then conceded, however, that there was no formal written or unwritten policy regarding the treatment of Predicasts customer lists (Tr. 44); that no special access code was needed to access the lists on the computer; that copies of the customer lists were discarded in hallways and handled by general building personnel; and that copies were provided to other departments regarding which he had no knowledge as to what treatment was accorded them. In contrast, Predicasts' marketing manager, Deborah Potts offered extensive testimony regarding the total lack of confidential treatment of the lists. According to Ms. Potts, Predicasts "... had sort of very loose handling of its customer list, and it really didn't have security around a customer list that you would expect" (DX QQQ at 13); copies of the customer lists were "readily available," to obtain a copy one needed only to "roll in and ask" (DX QQQ at 13); there was no security or signout procedure with respect to the lists (DX QQQ at 27); the lists were left on loading docks and in hallways (DX QQQ at 18, 40–41); and she as well as others took lists home because "there was very loose control on their lists, very loose" (DX QQQ at 40).

BTA also apparently attempts to make out a trade secrets claim in its industry studies as such. It is clear, however, that it was the policy of Predicasts to provide its analysts with personal copies of studies which they authored or helped prepare. Tr. 363. Indeed, plaintiff's expert and author of the Predicasts Robotics study, Neil Digeronimo, testified that he received his copy of the Robotics study after he had left Predicasts at the premises of CIRI, a competitor of Predicasts. Tr. 245–46. Mr. Burk also testified that the practice had been to give copies to analysts to show their families and friends. Tr. 39–40. In short there is no basis for a trade secret claim relating to the industry studies themselves.

Accordingly, plaintiff's trade secrets claims are not established.

## VI. CONCLUSION

The plaintiff's copyright infringement claim has been established, and judgment thereon is entered against the defendants, in the amount of $55,500.00. All of plaintiff's remaining claims are dismissed.

SO ORDERED.

### ON MOTION TO AMEND

Defendants bring a motion pursuant to Rule 59(e), F.R.Civ.P., for an order amending the judgment herein, entered on October 19, 1988. A corrected version of the opinion in this case was filed on October 28, 1988 (hereinafter, "Judgment"), and familiarity with that detailed opinion is presumed, which concluded, after a bench trial, that defendants had infringed plaintiff's robotics study, but dismissed all remaining claims of plaintiff. (Judgment at 35, 49).

On the issue of damages, the Court concluded that statutory damages and attorney fees, authorized under 17 U.S.C. § 504(c), are not available to plaintiff (Judgment at 36), and that plaintiff had failed to establish actual damages as a consequence of the infringement under § 17 U.S.C. § 504(a) (Judgment at 40). The Court did, however, find that defendants had acquired profits, through the infringement, of $55,500.00 and awarded these profits to plaintiff (Judgment at 37). The Court did not allow any deduction of costs from defendants' profits on the ground that the marginal, undocumented evidence on this point submitted by defendants was "insufficiently concrete" (Judgment at 37). Furthermore, the Court did not make an apportionment of defendants' profits between the infringing and non-infringing elements of their study, based on the Court's factual finding that those points of plaintiff's study which were most heavily infringed were the portions of the two reports "that most gave them value" (Judgment at 10).

Defendants now seek to alter the judgment on the grounds that the awarded profits included a substantial and impermissible non-cash component of market advantage, that defendants' costs set-off should have been allowed, and that an apportionment of profits between infringing and non-infringing elements in their work should have been applied. Plaintiff seeks an award of costs pursuant to 17 U.S.C. § 505.

## I. THE COMPUTATION OF DEFENDANTS' PROFITS

The Court notes at the outset that defendants on this motion assert that their gross cash profits derived from the sale of the infringing report were established at trial as being $9,745.00, even though there is some ambiguity in the trial record, principally between plaintiff's exhibit 7 and more generalized testimony of certain witnesses. Accordingly, the Court substitutes the figure of $9,745.00 as defendants' gross cash profit figure for its finding of "gross cash profits of $5,550.00" (Judgment at 37).

 The interesting, and novel, question on this motion is whether a competitor who infringes a rival's work and then drastically reduces the market price of its infringing work for a very limited time, where the true market value is not in dispute, for the admitted purpose of establishing a market advantage to the competitive disadvantage of the rival, can inferentially be held to have made non-cash profit which, if quantifiable, can be awarded to the infringed competitor. It is not disputed that defendants, who had left plaintiff's predecessor's employ to compete directly against them, drastically slashed the purchase price of their infringing report by 90%, from $1500 to $150 per copy, for a brief two or three month period. This occurred while their report was in direct competition with plaintiff's report, after which the infringing report's price was readjusted to its true market level of $1500. Defendants insist that the greatly diminished gross *cash* receipts realized through such a market strategy are the sole basis for calculating the award. Plaintiff insists that the much higher, regular list price, at which a number of copies of the infringing

publication was also sold, is the more accurate and just measure of defendants' gross profits.

The key evidence on this point came from William Weiss, the president of the infringing defendant. He testified that the price of the infringing study was reduced pursuant to "a marketing strategy" to "get it into the hands of ... quantified buyers ... so that they could see that we do a very good study ... people who would then be upgraded to be buyers of the rest of our studies ... we would get people essentially to see that we have quality work," Tr. at 418, "so they would buy future studies ... [at the end of the special offer period of two or three months the price] was reinstated to the official $1500 price ... we weren't saying this is a $150 study ... [we were saying] 'Look, here is an example of what our $1500 studies are'" Tr. at 419. "Then a lot of people saw what we could do, and they ordered other studies, and it was a very good device for letting people know our quality." Tr. at 420.

It is thus uncontroverted, indeed this testimony was elicited by defendants' own counsel, that the 90% slashing of the infringing publication's price for a brief, special offer period, was calculated to, *and did*, bring a discrete, concrete market advantage which Mr. Weiss valued at the calculated cost of the differential between the regular copy price ($1500) and the sales copy price ($150). Accordingly, as thirty-seven (37) of the infringing copies were in fact sold through this market strategy, it is entirely reasonable and fair for the Court to conclude that Mr. Weiss has quantified in the plainest of terms the gross, non-cash profit of market advantage attributable to the infringement at $49,950.

The question is, however, in the narrow circumstances of this case, whether concretized, non-speculative market advantage of the type here indisputably established out of the infringer's own mouth is profit under § 504(b) of the Copyright Act. In *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir.1981), the Court noted that the term "profit" was not defined in the Copyright Act, but relied upon the definition in

Black's Law Dictionary, Revised Fourth Edition, that profit is the "[g]ain realized from business or investment over and above expenditure." This Court notes that the Fifth Edition additionally defines the term as follows: "Profit means accession of good, valuable results, useful consequences avail, gain ..." Black's Law Dictionary 1090 (5th ed. 1979). Defendants ignore the term profit, the statutory term, and instead address the meaning of "gross revenues", also used in the Act. But even this term does not help them. Black's Law Dictionary, merely defines gross revenues as gross receipts, which in turn are defined as "the total amount of money *or the value of other considerations* received from selling property or from performing services." *Id.* at 633 (emphasis added). The Supreme Court, in *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940), quoted language on this point from its previous decision in *Tilghman v. Proctor*, [125 U.S. 136, 8 S.Ct. 894, 31 L.Ed. 664 (1888)] a patent case: "'The profits, therefore, which [the infringer] must account for, are ... *the fruits of the advantage which he derived from the use* of that invention over what he would have had using other means open to the public and adequate to enable him to obtain an equally beneficial result.'" *Id.* 309 U.S. at 400, 60 S.Ct. at 684 (emphasis added). In other words, in both patent and copyright cases, infringing profit may be broader than mere cash profit. Furthermore, in the leading case of *Deltak, Inc. v. Advanced Systems, Inc.*, the Seventh Circuit Court of Appeals concluded that "saved acquisition cost is a measure of damages or profit" when calculating value of use under the statute, where cash was not generated. 767 F.2d 357, 362 n. 3 (7th Cir.1985); *see also Atlantic Monthly Co. v. Post Pub. Co.*, 27 F.2d 556, 560 (D.Mass.1928) (awarding saved acquisition cost as profit made by copyright infringer).

This Court finds nothing in the legislative history of § 504(b) as submitted and argued by defendants warranting a holding that the Congress intended the term "profits" to be limited only to actual cash profits, receipts or revenues generated by the

infringement. Accordingly, the Court concludes that all profits, cash or non-cash, that are attributable to the infringement, and are not remote or speculative, are recoverable under the Act.

Defendants cite a series of cases for the proposition that the non-cash profits found here by the Court are speculative and therefore not properly awardable. Their argument draws no distinction between cases where damages or profits were found, upon a record, to be non quantifiable or not quantified; where asserted damages or profits were found to be remote to the infringing activity and therefore not attributable to it; or where a theory of profit or damage was found to be speculative based upon unique and discrete circumstances of the case.

For example, in *Abeshouse v. Ultragraphics, Inc.,* relied upon heavily by the defendants, the Second Circuit Court of Appeals observed that "an award under § 504(b) must not be based upon undue speculation." 754 F.2d 467, 470 (2d Cir. 1985). There, the victim of an infringement claimed damage to the reputation of his posters resulting from the inferior quality of the infringing posters, and for damage to his ability to sell his posters in the future caused by the absence of a copyright notice on the infringing posters. The Court found that as no proof was offered and no effort made to assess the marketability of plaintiff's copyright during any time following the infringing acts, *"these* claims were *thus* too speculative to support any award of actual damages." *Id.* at 471 (emphasis added). In *Roy Export Company v. Columbia Broadcasting,* 503 F.Supp. 1137 (S.D.N.Y.1980), *aff'd,* 672 F.2d 1095 (2d Cir.1982), Judge Lasker found that CBS's profits from its infringement of plaintiff's Charlie Chaplin films could not be "actually ascertained" since the benefit was asserted to inhere in unmeasurable good will with its affiliates and increased prestige vis a vis its competitors. *Id.* at 1156–57. In *Orgel v. Clark Boardman Co. Ltd.,* 128 U.S.P.Q. 531 (S.D.N.Y.1960), *modified on other grounds,* 301 F.2d 119 (2d Cir.), *cert. denied,* 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962), Judge Dimmock endorsed a master's ruling that a claim that an infringing defendant, a lawyer, had achieved a general rise in income in his legal practice, was not "susceptible of computation ...", and by implication, not sufficiently connected in the record to the infringing conduct. *Id.* at 532. The Court in *Blackman v. Hustler Magazine, Inc.,* 620 F.Supp. 792 (D.D.C.1985), *aff'd in part and rev'd in part on other grounds,* 800 F.2d 1160 (D.C.Cir.1986), concluded, *as a fact,* that house ad space in a number of the infringer's magazines is "valueless as a revenue source." *Id.* at 802.

In short, the direct answer to these four citations of defendants is that in this case, the awarded non-cash profit is not only precisely quantified, but the quantification has been established by defendants' principal officer, and is neither challenged nor in dispute, and is conceded to have been received. Defendant's insist that there is no proof that the same number of studies would have been sold at $1500 as were actually sold at $150. This is irrelevant, since it is defendants' actual market advantage that is here valued, and was in fact received, according to Mr. Weiss.

Defendants' arguments on punitive damages and the creation of unauthorized remedies are irrelevant.

In summary, the Court finds that Mr. Weiss, far from indulging in speculation, gave the precise calculus as to what the bargain prices were expected to produce in non-cash benefits to Freedonia, and confirmed that the 90% price slashing was "a very good device", Tr. at 420, for achieving precisely what it was intended to do. Certainly the inference is permissible on this evidence, and the Court so concludes as a fact, that this "gain realized from business", *MCA Inc.,* 677 F.2d at 186, the new customers, the increased sales of other publications, and the new quality image in the marketplace, Tr. at 420, was the aggregate non-monetary equivalent, in the opinion of Mr. Weiss, the expert in the best position to know, of, at minimum, the disparity between the regular price and the bargain price of the infringing study.

Accordingly, the Court finds that gross profits of the infringer attributable to the infringement are established in the amount of $9,745.00 (cash profits) and $49,950.00 (non-cash profit) (market advantage) (Judgment at 37), for an award of $59,695.00.

## II. THE DEFENDANTS' EXPENSE DEDUCTIONS FROM GROSS PROFITS

■ Under § 504(b) of the Copyright Act, once the infringer's gross revenue is established, "the infringer is required to prove his or her deductible expenses ..." 17 U.S.C. § 504(b) If the infringer "does not assume this burden, or if its attempt to do so is found unacceptable by the court ... then the 'gross figure is left to stand as the profit factor.'" *Russell v. Price,* 612 F.2d 1123, 1130–31 (9th Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980). The defendant is required, of course, to render a true and complete accounting of the claimed costs. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1174–75 (9th Cir.1977). Where the defendant has failed to produce adequate records of his costs, any doubt must be resolved in favor of the plaintiff. *Shapiro, Bernstein & Co. v. Remington Records, Inc.,* 265 F.2d 263, 272–73 (2d Cir.1959).

■ The Court found that asserted expenses of direct salary costs paid to the authors of defendants' report, claimed to be $7,153.00, were "insufficiently concrete" (Judgment at 37), since defendants had placed no documentary evidence or systematic analysis in the record to support the claim. The only evidence in the record on the point is the asserted annual salaries of the two plagiarizing authors, Mr. Swift and Ms. Fetsko–Louie, and their testimony, in extremely general terms, of the percentage of their time over a multi-week period, that they devoted to writing defendants' robotics report.

A review of the very brief record on this claim is necessary. Defendants' president, Mr. Weiss, testified that Mr. Swift's salary in 1985 was $40,000 and that he believed Ms. Fetsko–Louie's salary "was about half that." Tr. at 959. As this went unchallenged by the plaintiff, the Court credits these two lines of testimony and concludes that the annual salary of the two employees in question for 1985 was as indicated by Mr. Weiss.

Mr. Swift's monthly salary would therefore have been $3,333.33, and Ms. Fetsko–Louie's monthly salary would have been $1,666.66. Mr. Swift asserted that during the period mid-August 1985 through mid-October, 1985 he routinely worked ten hour days, and spent 250 man-hours on the infringing study. Tr. at 888–889. This translates into fifty hours per week, and is the equivalent of approximately five weeks work. Accordingly, the amount of Mr. Swift's monthly salary attributable to his time expended on the infringing study is approximately $4,166.66. Ms. Fetsko–Louie said in a deposition that she devoted about 90% of a month's work to the infringing study. Defendant's Ex. MMM at 25–26. Accordingly, the amount of Ms. Fetsko–Louie's monthly salary attributed to her time expended on the infringing study is $1,499.99. Therefore the total salary cost to defendants attributable to preparation of the infringing study is claimed to be $5,666.65.

The Court in its original ruling on this offset claim, mindful of having resolved substantial credibility questions against Mr. Swift (Judgment at 16), and considering other evidence that Ms. Fetsko–Louie, in spite of her weak denials, had been the principal copier in the wholesale pirating of plaintiff's study through her markup of the so-called "smoking gun" exhibit, (Judgment at 14–15), declined to find adequate proof of defendants' salary set-off expenses. The Court concluded that without any documentation or corroboration, even from Mr. Weiss, it could not credit the skeletal and generalized testimony of Mr. Swift and Ms. Fetsko–Louie on the amount of time spent on the project in question.

The Court on reconsideration has taken note, however, of defendants' assertion that plaintiffs at trial did not in any way contest these salary expense set offs. Furthermore, the Court does not find bad faith in the failure to produce records of expend-

itures, as in *Blackman v. Hustler Magazine, Inc.*, 620 F.Supp. 792, and notes the Court's equitable power to make allowance, in spite of deficient documentation, for defendants' set-off expenses. See *Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89 (2d Cir.1985). Accordingly, on reconsideration, the Court vacates its prior finding of no deductible expenses proven, and concludes that defendants have established such expenses in the amount of $5,666.65.

## III. APPORTIONMENT OF PROFITS BETWEEN INFRINGING AND NON-INFRINGING ELEMENTS

■ The law is clear that defendants had the burden of proving what portion of their total profits resulted from non-infringing elements of their robotics study. *Sheldon v. Metro-Goldwyn Pictures, Corp.*, 309 U.S. 390, 405-06, 60 S.Ct. 681, 686-87, 84 L.Ed. 825 (1940); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 657 (2d Cir.1978). Furthermore, apportionment is appropriate only "where it is clear that all profits are not due to the use of the copyrighted material and the evidence is sufficient to provide a fair basis of decision." *Sheldon*, 309 U.S. at 402, 60 S.Ct. at 685; *Orgel* 301 F.2d at 121. The record in this case is absolutely bereft of any proof on the subject adduced by defendants.

Defendants now rely solely upon the thin reed of Plaintiff's author's subjective assumption that "maybe" one third to one half of prospective purchasers of industry studies, in general, purchase them solely to obtain numerical data and industry forecasts. Tr. at 151. This statement, such as it is, sheds no light on which portions of defendant's infringing study are both non-infringing and have quantifiable value, to allow a division of profits. Furthermore, the Court has found that the sections referred to by plaintiff's author, Neil DiGeronimo, were heavily infringed, and are the portions of both reports "that most gave them their value." Judgment at 10. But even assuming that defendants have carried their burden, which they have not, it is nonetheless inappropriate to attempt a division of profits where infringed portions are so suffused and inter-twined with non-infringing portions as to render such a division impossible. Such is the case here. The Court has found a broad infringing character throughout defendants' report. It cannot sensibly and responsibly extricate the gold from the dross, and in so doing assign a reliable value to the dross. A defendant who is responsible for the blending of the lawful with the unlawful, where it is impossible to separate the profits of the one from the profits of the other, shall not be heard to complain when all the profits are handled over to the plaintiff. *Sheldon*, 309 at U.S. 401-402, 60 S.Ct. at 684-85, 84 L.Ed. 825 (1940); *Belford, Clarke & Co. v. Scribner*, 144 U.S. 488, 508, 12 S.Ct. 734, 740, 36 L.Ed. 514 (1892); *Callaghan v. Myers*, 128 U.S. 617, 665-66, 9 S.Ct. 177, 191, 32 L.Ed. 547 (1888); *Alfred Bell & Co. v. Catalda Fine Arts*, 86 F.Supp. 399 (S.D. N.Y.1949), *aff'd*, 191 F.2d 99 (2d Cir.1951).

The Court agrees with defendants' observation that "while copyright defendants bear the burden of establishing that portion of its profits that are due to non-infringing aspects of its works, precise mathematical precision is not required." Defendant's Memorandum of Law at 15-16 (citing *Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, and *Orgel*, 301 F.2d at 121). The difficulty that confronts defendants here is a record that is without *any* precision on the matter. To put the matter plainly, the defendants have not coherently addressed the question of non-infringing elements of their report at either trial or in post-trial submissions. The twofold question which they have failed to address is: what is the value of the non-infringing elements and what portion of the profits were generated by these elements? The Court finds as a fact that the defendants have failed to carry their burden on *both* components of this question.

Accordingly, the Court adheres to its initial finding that no adequate basis for apportionment is established in the record.

**1242**

## IV. PLAINTIFF'S REQUEST FOR COSTS

Plaintiff seeks a discretionary award of its costs under 17 U.S.C. § 505. The application is denied on the grounds that a substantial portion of plaintiff's case was not successful; that the level of professional skill brought to bear in the case does not warrant the award; that the case was not especially complex or broad in scope; and that in light of damages awarded, the interests of justice do not require an award of costs.

## V. CONCLUSION

Judgment for plaintiff is therefore amended and altered to the sum of $54,-028.35 and the Clerk is directed to enter it accordingly.

SO ORDERED.